**Nos. 26-4902, 26-6685 (Consolidated)**

In The

# United States Court of Appeals

For The Ninth Circuit

| | |
|---|---|
| L.T., et al.,<br><br>*Plaintiffs-Appellees,*<br><br>vs.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, et al.,<br><br>*Defendants-Appellants.* | No. 26-4902<br><br>D.C. No.<br>Case No. 5:26-cv-00322-SSS-SPx<br>Central District of California, Riverside |
| L.T., et al.,<br><br>*Plaintiffs-Appellees,*<br><br>vs.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, et al.,<br><br>*Defendants-Appellants.* | No. 26-6685<br><br>D.C. No.<br>Case No. 5:26-cv-00322-SSS-SPx<br>Central District of California, Riverside |

On Appeal from the United States District Court for the Central District of California
Case No. 5:26-cv-00322-SSS-SPx
The Honorable Sunshine Sykes

**PLAINTIFFS-APPELLEES' ANSWERING BRIEF**

NICHOLAS REDDICK
nreddick@willkie.com
STEPHEN HENRICK
shenrick@willkie.com
ALYXANDRA VERNON
avernon@willkie.com
JACOB KARIM
jkarim@willkie.com
WILLKIE FARR & GALLAGHER LLP
333 Bush Street
San Francisco, California 94104
Telephone (415) 858-7400

VINCENT R. BIAGIOTTI (*pro hac vice*)
vbiagiotti@willkie.com
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019-6099
Tel: 212-728-8000

IMMIGRANT DEFENDERS LAW CENTER
ALVARO M. HUERTA
ahuerta@immdef.org
CARSON ADRIANNA SCOTT
cscott@immdef.org
ALISON STEFFEL
asteffel@immdef.org
634 S. Spring Street, 10th Floor
Los Angeles, CA 90014
*Tel: 213-634-0999*

PUBLIC COUNSEL
REBECCA BROWN
rbrown@publiccounsel.org
SOPHIA WRENCH
swrench@publiccounsel.org
AMELIA PIAZZA
apiazza@publiccounsel.org
BELINDA ESCOBOSA
bescobosa@publiccounsel.org
610 South Ardmore Avenue
Los Angeles, CA 90005
Tel: 213-385-2977

COALITION FOR HUMANE IMMIGRANT RIGHTS
CARL BERGQUIST (*pro hac vice*)
cbergquist@chirla.org
2351 Hempstead Road
Ottawa Hills, OH 43606
Tel: 310-279-6025

ADAM REESE
areese@chirla.org
2533 West Third Street, Suite 101
Los Angeles, CA 90057
Tel: 213-353-1333

*Attorneys for Plaintiffs-Appellees*

# TABLE OF CONTENTS

Page


INTRODUCTION ........................................................................................1

STATEMENT OF JURISDICTION.....................................................................4

STATEMENT OF THE ISSUES..........................................................................4

PERTINENT STATUTES ...................................................................................5

STATEMENT OF THE CASE.............................................................................5

A. ICE's Contract with GEO Group and the Performance-Based National Detention Standards.....................................................5

B. ICE's Oversight of GEO and Adelanto ............................................6

C. Past Instances of Substandard Conditions, Medical Neglect, and Abuse at Adelanto ...........................................................................8

D. Present Instances of Substandard Conditions, Medical Neglect, and Abuse at Adelanto ...........................................................................9

1. Inadequate Medical Care..........................................................10

2. Punitive Conditions..................................................................15

3. Disability Accommodations.....................................................17

E. Prior Proceedings..........................................................................18

1. The Preliminary Injunction Proceedings ..................................18

2. The First Appeal......................................................................19

3. Clarifications to the Preliminary Injunction ..............................20

4. Orders to Show Cause..............................................................22

5. The Second Appeal ..................................................................23

SUMMARY OF ARGUMENT ..........................................................................23

STANDARD OF REVIEW ...............................................................................34

ARGUMENT ...................................................................................................34

I. PLAINTIFFS HAVE ARTICLE III STANDING. ......................................34

A. Plaintiffs Have Established Concrete, Ongoing Harms.................35

B. Plaintiffs' Harms Are "Fairly Traceable" to the Government.......35

C. The Injunction Redresses Plaintiffs' Harms. ....40
II. CHIRLA HAS STANDING. ....42
III. THE DISTRICT COURT CORRECTLY GRANTED THE PRELIMINARY INJUNCTION. ....44
A. Plaintiffs Are Likely to Succeed on the Merits of Their Claims. ....45
B. Plaintiffs Established Irreparable Harm. ....57
C. The Balance of Hardships and Public Interest Favor an Injunction. ....57
IV. THE DISTRICT COURT DID NOT EXCEED ITS JURISDICTION IN MODIFYING THE PRELIMINARY INJUNCTION. ....58
V. THE PRELIMINARY INJUNCTION IS LAWFUL IN FORM AND SCOPE. ....62
A. The Decree Permissibly Binds ICE and Its Agents. ....63
B. The Decree Is Specific and Tailored. ....66
C. The Inclusion of a Remedial Plan Term Does Not "Refer to" Another Document. ....69
D. The Decree Does Not Delegate Substantive Authority to the Monitors. ....70
E. The Government Had Notice Before Modifications Were Made. ....72
F. The Decree Does Not Offend Separation of Powers. ....75
VI. THE DISTRICT COURT CORRECTLY CERTIFIED THE ADELANTO CLASS & DISABILITY SUBCLASS. ....76
A. 8 U.S.C. § 1252(f)(1) Does Not Bar Classwide Relief. ....77
B. Rule 23's Prerequisites Are Satisfied. ....80
C. Rule 23(b)(2) Certification Was Proper, and *CASA* Does Not Apply. ....83
CONCLUSION ....85

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A&M Records, Inc. v. Napster*,
284 F.3d 1091 (9th Cir. 2022) ....................................3, 71

*K.C. ex rel. Africa H. v. Shipman*,
716 F.3d 107 (4th Cir. 2013) ....................................63

*Al Otro Lado v. EOIR*,
138 F.4th 1102 (9th Cir. 2025) ....................................78

*Ariz. All. for Retired Ams. v. Mayes*,
186 F.4th 622 (9th Cir. 2026) ....................................43

*Armstrong v. Brown*,
768 F.3d 975 (9th Cir. 2014) ....................................*passim*

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015)....................................79

*Armstrong v. Schwarzenegger*,
622 F.3d 1058 (9th Cir. 2010) ....................................38

*Astra USA, Inc. v. Santa Clara Cnty.*,
563 U.S. 110 (2011)....................................79

*Bell v. Wolfish*,
441 U.S. 520 (1979)....................................50, 53, 55

*Bennett v. Spear*,
520 U.S. 154 (1997)....................................36

*Black Lives Matter L.A. v. City of Los Angeles,*
113 F.4th 1249 (9th Cir. 2024) ....................................82

*Blum v. Yaretsky*,
457 U.S. 991 (1982)....................................37

*Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*,
29 F.4th 468 (9th Cir. 2022) ....................................................................63

*Castle v. Eurofresh, Inc.*,
731 F.3d 901 (9th Cir. 2013) ....................................................................57

*Castro v. Cnty. of Los Angeles*,
833 F.3d 1060 (9th Cir. 2016) ..............................................................27, 46

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983)....................................................................................35

*Cobell v. Norton*,
334 F.3d 1128 (D.C. Cir. 2003).................................................................74

*Columbia Basin Apartment Ass'n v. City of Pasco*,
268 F.3d 791 (9th Cir. 2001) ....................................................................43

*Comm. of Cent. Am. Refugees v. INS*,
795 F.2d 1434 (9th Cir. 1986) ..................................................................75

*Correctional Services Corp. v. Malesko*,
534 U.S. 61 (2001)....................................................................................39

*County of Riverside v. McLaughlin*,
500 U.S. 44 (1991)..............................................................................24, 35

*Csutoras v. Paradise High School*,
12 F.4th 960 (9th Cir. 2021) ...............................................................29, 56

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*,
489 U.S. 189 (1989)............................................................................38, 45

*Doe v. Kelly*,
878 F.3d 710 (9th Cir. 2017) ....................................................................45

*Drakes Bay Oyster Co. v. Jewell*,
747 F.3d 1073 (9th Cir. 2014) ..................................................................57

*Edmo v. Corizon, Inc.*,
935 F.3d 757 (9th Cir. 2019) ....................................................................69

*Evitts v. Lucey*,
469 U.S. 387 (1985)....................................................................................55

*Firefighters Local Union No. 1784 v. Stotts*
467 U.S. 561 (1984) ..................................................................................61

*Flores v. Barr*,
934 F.3d 910 (9th Cir. 2019) ....................................................................54

*Fortyune v. Am. Multi-Cinema, Inc.*,
364 F.3d 1075 (9th Cir. 2004) ..............................................3, 31, 63, 67

*Fraihat v. U.S. Immigr. & Customs Enf't*,
16 F.4th 613 (9th Cir. 2021) .......................................................... *passim*

*Friends of the Everglades, Inc. v. Sec'y of U.S. Dep't of Homeland Sec.*,
174 F.4th 822 (11th Cir. 2026) ...................................................................79

*FTC v. Enforma Natural Products, Inc.*,
362 F.3d 1204 (9th Cir. 2004) ....................................................................74

*Garland v. Aleman Gonzalez*,
596 U.S. 543 (2022)...................................................................33, 77, 78

*Gates v. Shinn*,
98 F.3d 463 (9th Cir. 1996) .......................................................................71

*Gen. Tel. Co. of the Nw., Inc. v. EEOC*,
446 U.S. 318 (1980).....................................................................................80

*Gen. Building Contractors Ass'n v. Pennsylvania*,
458 U.S. 375 (1982).....................................................................................64

*GEO Grp., Inc. v. Newsom*,
50 F.4th 745 (9th Cir. 2022) (en banc) ......................................................75

*Geo Grp., Inc. v. Newsom*,
50 4th 745 (9th Cir. 2022) ..........................................................................39

*Golden State Bottling Co., Inc. v. NLRB*,
414 U.S. 168 (1973).....................................................................................62

*Gon v. First State Ins. Co.*,
871 F.2d 863 (9th Cir. 1989) ....................60

*Gonzalez v. Arizona*,
677 F.3d 383 (9th Cir. 2012) ....................43

*Gordon v. Cnty. of Orange*,
888 F.3d 1118, 1125 (9th Cir. 2018) ....................26, 27, 45

*Granny Goose Foods, Inc. v. Bhd. of Teamsters*,
415 U.S. 423 (1974)....................73

*Graves v. Arpaio*,
623 F.3d 1043 (9th Cir. 2010) ....................53

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) ....................83

*Harris v. Bd. of Supervisors, L.A. Cnty.*,
366 F.3d 754 (9th Cir. 2004) ....................58

*Harris v. City of Philadelphia*,
47 F.3d 1333 (3d Cir. 1995) ....................64

*Hernandez v. Sessions*,
872 F.3d 976 (9th Cir. 2017) ....................*passim*

*Hernandez Roman v. Wolf*,
829 F. App'x 165 (9th Cir. 2020) ....................9

*Hodgers-Durgin v. de la Vina*,
199 F.3d 1037 (9th Cir. 1999) (en banc) ....................75, 83

*Hoptowit v. Ray*,
682 F.2d 1237 (9th Cir. 1982) ....................47, 54

*Hubbard v. City of San Diego*,
139 F.4th 843 (9th Cir. 2025) ....................44

*Hughes v. United States*,
342 U.S. 353 (1952)....................73

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977)....................................................................................42

*Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*,
774 F.3d 935 (9th Cir. 2014) ..........................................................................65

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
512 U.S. 821 (1994)....................................................................................66

*Jones v. Blanas*,
393 F.3d 918 (9th Cir. 2004) ..........................................................27, 28, 50, 52

*Kansas v. Crane*,
534 U.S. 407 (2002)....................................................................................53

*Keenan v. Hall*,
83 F.3d 1083 (9th Cir. 1996), *opinion amended on denial of reh'g*,
135 F.3d 1318 (9th Cir. 1998) ..........................................................................53

*Keenan v. Hall*,
135 F.3d 1318 (9th Cir. 1998) ..........................................................................53

*Logue v. United States*,
412 U.S. 521 (1973)...............................................................................25, 40

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)...............................................................................23, 35

*M.S. v. Brown*,
902 F.3d 1076 (9th Cir. 2018) ..........................................................................40

*In re MacNeil*,
907 F.2d 903 (9th Cir. 1990) ..........................................................................65

*Maloney v. T3Media, Inc.*,
853 F.3d 1004 (9th Cir. 2017) ..........................................................................47

*Matsumoto v. Labrador*,
122 F.4th 787 (9th Cir. 2024) .....................................................................39, 41

*McClatchy Newspapers v. Central Valley Typographical Union No. 46*, 686 F.2d 731 (9th Cir. 1982) ..........................................................61, 74, 75

*In re Mego Fin. Corp. Sec. Litig.*,
213 F.3d 454 (9th Cir. 2000) ......................................................................80

*Meinhold v. U.S. Dep't of Def.*,
34 F.3d 1469 (9th Cir. 1994) ..................................................................3, 30, 60

*Melendres v. Arpaio*,
699 F.3d (9th Cir. 2012) .......................................................................29, 57

*Melendres v. Skinner*,
113 F.4th 1126 (9th Cir. 2024) ..............................................................*passim*

*Mendia v. Garcia*,
768 F.3d 1009 (9th Cir. 2014) ......................................................................36

*Mercado v. Noem*,
800 F. Supp. 3d 526 (S.D.N.Y. 2025) ...........................................................53

*Minneci v. Pollard*,
565 U.S. 118 (2012)........................................................................................39

*Murthy v. Missouri*,
603 U.S. 43 (2024)....................................................................................*passim*

*Mullin v. Al Otro Lado*, 609 U.S. 258 (2026)....................................................78

*NAACP v. Ala. ex rel. Patterson*,
357 U.S. 449 (1958)........................................................................................43

*Nat'l Audubon Soc'y, Inc. v. Davis*,
307 F.3d 835 (9th Cir. 2002) ........................................................................36

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
422 F.3d 782 (9th Cir. 2005) ........................................................................49

*Nat'l Res. Def. Council, Inc. v. Sw. Marine, Inc.*,
242 F.3d 1163 (9th Cir. 2001) ...................................................................*passim*

*Newman v. Graddick*,
740 F.2d 1513 (11th Cir. 1984) ....................................................................66

*Noem v. Vasquez Perdomo*,
146 S. Ct. 1 (2025)........................................................................................43

*Nw. Ass'n of Indep. Schs. v. Labrador*,
166 F.4th 1148 (9th Cir. 2026) ........................................................................55

*O'Shea v. Littleton*,
414 U.S. 488 (1974)..........................................................................................75

*Parsons v. Ryan*,
754 F.3d 657 (9th Cir. 2014) ...........................................................................*passim*

*Parsons v. Ryan*,
912 F.3d 486 (9th Cir. 2018) ......................................................................63, 67

*Pasadena City Board of Education v. Spangler*,
427 U.S. 424 (1976)..........................................................................................69

*Pasadena Republican Club v. W. Justice Ctr.*,
985 F.3d 1161 (9th Cir. 2021) .........................................................................64

*Pastora by & through Toghraie v. Cnty. of San Bernardino*,
2023 WL 3734264 (9th Cir. May 31, 2023)......................................................46

*Patchak v. Zinke*,
583 U.S. 244 (2018)..........................................................................................78

*Pitts v. Terrible Herbst, Inc.*,
653 F.3d 1081 (9th Cir. 2011) ....................................................................24, 35

*Plata v. Schwarzenegger*,
560 F.3d 976 (9th Cir. 2009) ...........................................................................65

*Plata v. Schwarzenegger*,
603 F.3d 1088 (9th Cir. 2010) .........................................................................72

*Premier Commc'ns Network, Inc. v. Fuentes*,
880 F.2d 1096 (9th Cir. 1989) .........................................................................34

*Rannis v. Recchia*,
380 F. App'x 646 (9th Cir. 2010)......................................................................80

*Rawson v. Recovery Innovations, Inc.*,
975 F.3d 742 (9th Cir. 2020) ...........................................................................*passim*

*Reno Air Racing Association v. McCord*,
452 F.3d 1162 (9th Cir. 2006) ......................................................................69

*Roman v. Wolf*,
977 F.3d 935 (9th Cir. 2020) ..........................................................................*passim*

*Roman v. Wolf*,
2020 WL 1952656 (C.D. Cal. Apr. 23, 2020) ......................................................9

*Roman v. Wolf*,
2020 WL 5797918 (C.D. Cal. Sept. 29, 2020) .....................................................9

*Ronduen v. GEO Group, Inc.*,
2025 WL 3050059 (C.D. Cal. Sept. 26, 2025) ...................................................82

*Rumsfeld v. Padilla*,
542 U.S. 426 (2004)..........................................................................................39

*Sandin v. Connor*,
515 U.S. 472 (1995).....................................................................................47, 54

*Sandoval v. Cnty. of San Diego*,
985 F.3d 657 (9th Cir. 2021) ..........................................................................48

*Schmidt v. Lessard*,
414 U.S. 473 (1974)..........................................................................................67

*Seattle Audubon Soc'y v. Evans*,
952 F.2d 297 (9th Cir. 1991) ..........................................................................58

*SEC v. Hickey*,
322 F.3d 1123 (9th Cir. 2003) ........................................................................65

*Shorter v. Baca*,
895 F.3d 1176 (9th Cir. 2018) ........................................................................55

*Simon v. City and Cnty. of San Francisco*,
135 F.4th 784 (9th Cir. 2025) .............................................................60, 74, 75

*Stone v. City & Cnty. of San Francisco*,
968 F.2d 850 (9th Cir. 1992) ..........................................................................*passim*

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......................................................... 65, 84

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .......................................................... 34, 83, 85

*Tucson Airport Auth. v. Gen. Dynamics Corp.*,
136 F.3d 641 (9th Cir. 1998) .......................................................... 79

*Tuscon v. City of Seattle*,
91 F.4th 1318 (9th Cir. 2024) .......................................................... 40

*U.S. Parole Comm'n v. Geraghty*,
445 U.S. 388 (1980) .......................................................... 35

*U.S. v. Hinkson*,
585 F.3d 1247 (9th Cir. 2009) .......................................................... 34

*U.S. v. Int'l Bhd. of Teamsters*,
899 F.2d 143 (2d Cir. 1990) .......................................................... 66

*United States v. Holtzman*,
762 F.2d 720 (9th Cir. 1985) .......................................................... 62

*United States v. Orleans*,
425 U.S. 807 (1976) .......................................................... 25, 40

*United States v. Rylander*,
460 U.S. 752 (1983) .......................................................... 66

*Updike v. Multnomah Cnty.*,
870 F.3d 939 (9th Cir. 2017) .......................................................... 29, 56

*Valdivia v. Schwarzenegger*,
599 F.3d 984 (9th Cir. 2010) .......................................................... 61

*Van Dinh v. Reno*,
197 F.3d 427 (10th Cir. 1999) .......................................................... 79

*Vasquez Perdomo v. Noem*,
148 F.4th 656, 676 (9th Cir. 2025) .......................................................... 26, 42, 43

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) .......... 33, 80

*Walters v. Reno*,
145 F.3d 1032 (9th Cir. 1998) .......... 33, 80, 84

*Washington v. Trump*,
145 F.4th 1013 (9th Cir. 2025) .......... 34

*West v. Atkins*,
487 U.S. 42 (1988) .......... *passim*

*Whitaker v. Garcetti*,
486 F.3d 572 (9th Cir. 2007) .......... 65

*Winter v. Nat'l Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 26, 44

*Zadvydas v. Davis*,
533 U.S. 678 (2001) .......... 45

**Statutes**

6 U.S.C. § 112 .......... 2

8 U.S.C. § 1103 .......... 2, 6

8 U.S.C. § 1226 .......... 2, 39

8 U.S.C. § 1231 .......... *passim*

8 U.S.C. § 1252 .......... *passim*

28 U.S.C. § 1292 .......... 4, 61

28 U.S.C. § 1331 .......... 4

29 U.S.C. § 794 .......... 56

Rehabilitation Act .......... 29, 33, 56, 77

**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 23 .......... *passim*

Fed. R. Civ. P. 53 .......... 71

Fed. R. Civ. P. 62.1 .......... 59

Fed. R. Civ. P. 62 .......... 30, 58, 59

Fed. R. Civ. P. 65 .......... *passim*

Fed. R. Evid. 706 .......... 71

**Other Authorities**

U.S. Const., art. V .......... 1, 33, 79

# INTRODUCTION

Since beginning its immigration raids, the Government has detained thousands, purposefully confining them to conditions so squalid that many detainees self-deport. At the Adelanto ICE Processing Center ("Adelanto"), mold grows on the walls, water is undrinkable, food is unsanitary, outdoor-time is severely restricted, medical care is largely nonexistent, and disability accommodations are not provided. Detainees who speak out face solitary confinement for 23 hours a day. Three detainees have died.

Relying on twenty-five fact declarations, two unrebutted experts, and multiple investigative reports, the district court correctly found that these conditions violate the Fifth Amendment and the Rehabilitation Act and ordered the Government to remedy them. The district court separately certified a facility-wide class and a disability sub-class. Both decisions are well-supported by the record and the law, and their consequences profoundly important. Under them, the Government cannot hide behind a private contractor to avoid its constitutional responsibility for those it detains. This Court has twice denied the Government's motions to stay the injunction, *L.T. v. U.S. Immigr. & Customs Enf't*, No. 26-4902, Dkt. 22.1 (9th Cir. Aug. 20, 2026) [hereinafter Order Denying Stay]; *L.T. v. U.S. Immigr. & Customs Enf't*, No. 26-4902, Dkt. 38.1 (9th Cir. Oct. 21, 2026) [hereinafter Second Stay Order], and should now affirm entirely.

The Government may detain immigrants pending removal proceedings, 8 U.S.C. § 1226, but must "arrange for appropriate places of detention," *id.* § 1231(g)(1), and work with states and localities to establish "acceptable conditions of confinement," *id.* § 1103(a)(11)(B). The 2011 Performance-Based National Detention Standards ("PBNDS") require humane treatment, prohibit retaliatory discipline, and establish standards for medical care, nutritious meals, potable water, outdoor recreation, sanitation, and clean clothing and bedding. 5-SER-1092 (PBNDS identify the Constitution and Supreme Court case law as "legal reference material").

Under 6 U.S.C. § 112(b)(2), the Government contracted with GEO Group ("GEO") to operate Adelanto and comply with the PBNDS. ICE personnel oversee compliance and may require corrective action. ICE can withhold payment or impose financial penalties for non-compliance. The ICE Office of Detention Oversight ("ODO") also inspects detention facilities for noncompliance.

Despite that oversight, the Government argues that it cannot control conditions at Adelanto because GEO manages day-to-day operations. From there, the Government argues Plaintiffs cannot establish traceability, redressability, or the merits of their claims against the Government, and that the injunction improperly binds GEO, a non-party. But a private contract does not void the Government's responsibility to ensure that detention conditions are constitutional. *West v. Atkins*,

487 U.S. 42, 56 (1988); *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 753 (9th Cir. 2020). Both the district court and this Court recognized as much. 1-ER-30; Order Denying Stay at 2-3.

The Government's remaining challenges to the injunction's scope and class certification fare no better. The injunction specifies requirements for food, water, medical care, headcounts, confinement, and visitation. Rule 65(d) does not require more; an injunction fails only if it is "so vague that [it] ha[s] no reasonably specific meaning," which this is not. *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1087 (9th Cir. 2004) (citation omitted). Separately, the classes are well-supported. Every detainee is subject to facility-wide policies and practices, and systemic failures at Adelanto warrant a single classwide injunction under Rule 23(b)(2).

In its second appeal, the Government argues that the district court lacked jurisdiction to clarify the injunction. But the clarifications imposed no new substantive obligations or adjudicated new claims. They simply made explicit that the Monitors could assess compliance, clarified their access to Adelanto, and specified permissible communications with the court. That is entirely permissible under this Court's precedent. *E.g.*, *Meinhold v. U.S. Dep't of Def.*, 34 F.3d 1469, 1480 n.14 (9th Cir. 1994) (district court retained jurisdiction pending appeal to clarify its injunction and supervise compliance); *A&M Records, Inc. v. Napster*, 284 F.3d 1091, 1099 (9th Cir. 2022) (same).

This Court should affirm.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) over both consolidated appeals.

## STATEMENT OF THE ISSUES

1. Whether the district court correctly found—consistent with controlling precedent—that the Government cannot contract out its responsibility to provide constitutional conditions.

2. Whether the district court acted within its discretion in granting the preliminary injunction where the unrebutted record shows that at Adelanto, detainees are denied medical care, prescribed medications, and mental health treatment, and are confined in punitive conditions with undrinkable water, inedible food, unsanitary living quarters, and overly restrictive visitation and outdoor-recreation policies.

3. Whether the preliminary injunction, which specifies what the Government must do to remedy the constitutional and statutory violations established by the record, is properly tailored and satisfies Rule 65(d).

4. Whether the district court had jurisdiction pending appeal to clarify court-appointed Monitors' monitoring duties and access requirements in the preliminary injunction, without altering any substantive requirements.

5. Whether the district court abused its discretion by certifying the Adelanto Class and Disability Subclass to address systemic detention failures under Rule 23(a) and (b)(2).

## PERTINENT STATUTES

Pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A. ICE's Contract with GEO Group and the Performance-Based National Detention Standards

ICE, a federal agency within the United States Department of Homeland Security ("DHS"), enforces civil immigration laws, including the detention and removal of immigrants. In 2019, ICE contracted with GEO to detain, transport, and provide medical services to detainees at Adelanto. 3-SER-628-42.

Among other things, the contract requires GEO to comply with the PBNDS, which require ICE to detain people "in the most humane manner possible." 3-SER-630; 5-SER-1059. The PBNDS require timely medical, dental, and mental health care, including triage of medical requests within 24 hours, continuity of care, administration of prescribed medications, and 24-hour emergency services. 5-SER-1076-81.

The PBNDS also require disability accommodations; safe drinking water, nutritious meals, and sanitary facilities; modesty panels in lavatories and reasonable

privacy in bathing and toilet facilities; and clean, laundered, temperature-appropriate clothing and bedding. 5-SER-1058-92.

The PBNDS further establish outdoor recreation standards; permit restrictions on visitation only for reasonable considerations, including staffing and safety; and limit administrative segregation to specified grounds and disciplinary segregation to cases involving a hearing and finding of misconduct. 5-SER-1071-91. GEO's contract independently requires at least four hours of daily outdoor recreation. 4-ER-603.

### B. ICE's Oversight of GEO and Adelanto

The Immigration and Nationality Act requires federal immigration officials to "arrange for appropriate places of detention[,]" 8 U.S.C. § 1231(g)(1), and to work with states and localities to establish "acceptable conditions of confinement[.]" 8 U.S.C. § 1103(a)(11)(B). The Government maintains extensive control over conditions at Adelanto, and recently purchased Adelanto from GEO. 1-SER-259-60.

ICE also employs personnel to oversee conditions at Adelanto. The Los Angeles ICE Enforcement and Removal Operations ("ERO") office, for example, oversees GEO's "performance and adherence to all contract requirements" at Adelanto. 6-SER-1267. ICE ERO assigns an Independent Detention Services Manager ("DSM") whose sole responsibility is to monitor for and ensure compliance

with ICE detention policies, procedures, and detention standards. *Id.* The DSM, with other ICE ERO employees, work on-site at Adelanto, and are responsible for implementing any corrective actions identified by the DSM. 5-SER-1107-08.

An ICE Immigration Health Services Corp ("IHSC") employee oversees medical services at Adelanto, and ensures compliance with the detention standards. 5-SER-1141. ICE also controls staffing at Adelanto. 5-SER-1104-05.

For each facility, ICE has a Contracting Officer Representative who oversees contract performance, reviews staffing and corrective-action plans, and monitors compliance. 6-SER-1267. If a contractor fails to comply, ICE can document deficiencies in a Discrepancy Report, require a corrective action plan, withhold payment, or impose financial penalties. 1-SER-11.

Finally, ICE conducts routine and congressionally mandated inspections of facilities, like Adelanto—a tool to hold "detention facility contractors accountable for not meeting performance standards." 1-SER-8-12. The ICE Office of Detention Oversight ("ODO"), evaluates PBNDS compliance at detention facilities, including Adelanto, and reports deficiencies and corrective actions to ICE leadership. 5-SER-1097.

ODO inspected Adelanto on September 16-18, 2025. Despite repeated complaints of substandard medical care and inhumane conditions, *see infra* at 9-17,

ODO awarded Adelanto a "good" rating, and inspectors found no medical-care deficiencies. 2-SER-316.

### C. Past Instances of Substandard Conditions, Medical Neglect, and Abuse at Adelanto

State and federal authorities have repeatedly documented serious deficiencies at Adelanto. In 2015, the DHS Office for Civil Rights and Civil Liberties ("CRCL") warned that medical leadership "was not competent" and negligent medical care resulted. 1-SER-40. In 2017, CRCL again found "seriously deficient" medical care that did not meet the 2011 PBNDS. *Id*. CRCL further warned that the refusal to correct this "critical failure" contributed to serious injuries and detainee deaths. *Id*. In 2018, CRCL found that an "alarming" number of detainees with serious mental illnesses endured "shockingly" prolonged solitary confinement. 1-SER-87.

That same year, the DHS Office of Inspector General documented inadequate medical and mental health care, suicide hazards, and improper disciplinary use of solitary confinement. 5-SER-1041-52.

Disability Rights California ("DRC") likewise found inadequate care, disability-law violations, and "punitive, prison-like conditions" resulting in abuse and neglect of detainees with disabilities. 1-SER-185-87, 200-03.

Courts also intervened. During the COVID-19 pandemic, a district court found that the Government's "callous disregard of its detainees' constitutional right to reasonable safety" warranted an injunction reducing Adelanto's population.

*Roman v. Wolf*, 2020 WL 1952656, at *8, 12 (C.D. Cal. Apr. 23, 2020), *aff'd in part, vacated in part sub nom.*, *Hernandez Roman v. Wolf*, 829 F. App'x 165 (9th Cir. 2020), *and supplemented*, 2020 WL 5797918 (C.D. Cal. Sept. 29, 2020). That court later enjoined the Government's use of toxic chemicals. *Roman v. Wolf,* 2020 WL 5797918, at *5 (C.D. Cal. Sept. 29, 2020), *aff'd in part, vacated in part, remanded*, 977 F.3d 935 (9th Cir. 2020). This Court largely affirmed that injunction, agreeing the "Government likely failed to meet its constitutional duty to provide reasonable safe conditions to Plaintiffs," and that its "inadequate response reflected a reckless disregard for detainee safety[.]" *Roman*, 977 F.3d at 943.

Between 2020 and early 2025, Adelanto housed fewer than a dozen detainees. 5-SER-1023-26. But after restrictions on new intakes were lifted, its population surged from 153 detainees to over 1,200 in a week. *Id*. A long-time staff member warned Adelanto was unprepared for the influx. 5-SER-1029. Detainees soon reported inadequate medical care and punitive conditions.

### D. Present Instances of Substandard Conditions, Medical Neglect, and Abuse at Adelanto

Plaintiffs presented twenty-five fact declarations, two expert declarations, and ten reports to the district court, documenting serious, ongoing medical neglect, punitive conditions, and abuse at Adelanto. As of this appeal, three detainees have died at Adelanto following medical emergencies and failure to receive proper treatment. 2-SER-318-28.

### 1. Inadequate Medical Care

Adelanto's medical care system fails to screen detainees, respond to medical requests, provide access to specialty care, and administer medications properly. All twenty-five fact declarations describe similar experiences of medical neglect at Adelanto. *E.g.*, 2-SER-572-73-¶¶ 15-17 (13-week pregnant woman deprived antibiotic despite informing ICE of pregnancy and UTI at intake); 3-SER-731-34-¶¶ 7-21 (10-day wait for initial medical intake despite cardiac condition that led to three heart attacks); 3-SER-583-¶¶ 16 (lupus medication withheld for at least six weeks after arrival); 2-SER-561-62-¶¶ 13-16 (one-month delay for numerous untreated antibiotic-resistant skin infections leading to emergency surgery); 3-SER-715-16-¶¶ 15-20 (weeklong delay for bloody stool resulting in pain at 9 out of 10 leading to fainting and emergency blood transfusions); 3-SER-645-47-¶¶ 5-18 (14 to 15 day delay for swelling, diarrhea, and vomiting leading to four-day hospitalization and weeks of immobility); 2-SER-497-¶ 12 (epilepsy and cholesterol medication prescribed for elderly lady without epilepsy or cholesterol issues); 3-SER-675-78-¶¶ 4-19 (post-surgery patient only offered ibuprofen and not given basic gauze or wound-cleaning supplies for large cyst); 3-SER-694-95-¶¶ 10-11 (infected finger burst with blood and black pus treated by wrapping finger with toilet paper, not bandages or wound-cleaning supplies, for over a week). Four are particularly representative.

***Xiaoman Ding.*** Ms. Ding was diagnosed with a pituitary brain tumor in 2019 and suffers constant headaches, eye pain, vision loss, and difficulty walking. 3-SER-682-¶ 5. Despite reporting her prescriptions, Ding received neither a prompt follow-up examination nor her medications. Instead, staff gave her only Tylenol and ibuprofen to manage her pain. *Id.*

Between June and September 2025, Ding submitted nearly 100 medical requests for help with her headaches and depression. 3-SER-684-¶ 13. Staff left those requests unanswered until September 2025, when Ding finally saw a counselor for her depression. She did not see a general physician for her headaches until October, and never saw a neurologist. *Id.* However, her headaches were so debilitating that she tried to commit suicide to try and "catch someone's attention [to] get … to a doctor." 3-SER-687-¶ 29.

***Sevak Mesrobian.*** ICE officers dislocated Mr. Mesrobian's shoulder during his arrest. 3-SER-774-¶ 4. Despite telling staff about the dislocation at intake, he received no treatment. *Id.* To this day, he cannot raise his arm above his shoulder on one side. *Id.*

Mesrobian has epilepsy, which has worsened during his detention at Adelanto and caused progressive brain damage. 3-SER-775-76-¶¶ 9-12. Around August 2025, Mesrobian suffered a severe seizure, during which he was vomiting. 3-SER-

777-¶ 16. The guards took 30 minutes to attend to him. Another detainee—not medical professionals or guards—turned Mesrobian on his side to protect him. *Id.*

In January 2026, Mesrobian experienced multiple seizures while lying in his bed. Rather than protect him from injury, guards allegedly dragged him onto the floor between two metal bunk beds, where he repeatedly struck his head against the metal frames. 3-SER-778-¶ 19. One guard pushed his face into the floor, restricting his breathing, until other detainees intervened. *Id.* Mesrobian went 25 minutes without oxygen, during which his skin began turning purple. Emergency medical technicians did not arrive until approximately 45 minutes after his seizures began. 3-SER-777-¶ 16. Again, fellow detainees—not guards—protected his head and turned him onto his side. 3-SER-778-¶ 19. On another occasion, Mesrobian suffered a seizure while alone in a medical segregation observation room, where guards, not nurses, monitored him. 3-SER-780-¶ 27.

Adelanto's medication practices compound the danger. Mesrobian regularly misses doses of Keppra because nurses fail to wake him when distributing medication or refuse to administer it after he has eaten, even though taking the medication on an empty stomach causes severe nausea, dizziness, and abdominal pain. 3-SER-780-81-¶¶ 28-32. These missed doses expose him to an increased risk of further seizures. 3-SER-780-82-¶¶ 28-29, 33.

***Jose Mauro Salazar Garza.*** In September 2024, at another ICE facility, another detainee bit off Mr. Garza's pinky finger, requiring surgical amputation. 3-SER-693-¶ 5. Mr. Garza continued to have "intense and pulsing pain" in his hand, which he reported at intake at Adelanto. 3-SER-694-¶ 7. In February 2025, after he was transferred to Adelanto, a doctor ordered an MRI and warned that Mr. Garza might need another surgery. 3-SER-694-¶ 8. But because the MRI required ICE approval, he waited months. *Id.*

While waiting for the MRI, he began experiencing increased pain in his hand. 3-SER-694-¶ 9. His finger began turning yellow and his hand became so swollen that he could not use it to tie his shoes or brush his teeth. *Id.* In June 2025, the tip of his finger burst and "blood and black pus" began leaking from his finger "like a worm." 3-SER-694-¶ 10. Despite a guard radioing for help, nobody came to take Mr. Garza to the medical unit or provided bandages or wound-cleaning supplies. Instead, he had to wrap the tip of his finger in toilet paper. *Id.* More than a week later, staff finally brought Mr. Garza to the hospital for an MRI. 3-SER-694-95-¶ 11. He still has tingling sensations in his finger and worries about getting another infection. *Id.*

Mr. Garza also developed a severe staph infection at Adelanto. Despite his entire arm swelling and becoming discolored, staff waited "a few days" before taking him to the hospital for surgery. 3-SER-695-¶¶ 12-13. When he returned to

Adelanto, the staff did not give him the supplies he needed to keep his arm clean and dry. The wound became infected again. 3-SER-695-¶ 13.

***L.T.*** About three years ago, L.T. suffered a stroke that resulted in paralysis in the right side of his body. 4-SER-954-55-¶¶ 6, 9. He also has diabetes, sleep apnea, high blood pressure, high cholesterol, and arthritis. 4-SER-954-57-¶¶ 6, 15. Adelanto staff have repeatedly denied L.T. treatment for these conditions. For example, L.T. requested a sleep apnea machine—without which he is at high risk of suffering another stroke—but staff denied his request. 4-SER-957-¶ 15. Staff also failed to give him his diabetes medication consistently; at one point, he went four weeks without medication. 4-SER-958-¶ 19.

***Expert Opinion.*** Relying on these declarations, other medical records, and investigations of Adelanto, Dr. Altaf Saadi, Plaintiffs' expert, found that: (1) the medical intake and assessment processes fail to adequately identify and treat medical conditions; (2) the sick-call system does not provide timely care; (3) detainees with chronic medical issues do not receive timely or adequate medical treatment or accommodations; (4) prescription medication is not properly administered; (5) detainees that require specialty care do not receive that care; (6) medical emergencies are not addressed in a timely manner; and (7) mental health issues are worsened by the conditions. 2-SER-423-40-¶¶ 14-71. These deficiencies exposed

detainees to serious medical complications, worsening conditions, and possible death. 2-SER-422-465-¶¶ 12(h), 149.

### 2. Punitive Conditions

All twenty-five declarations recount the dangerous and inhumane conditions at Adelanto. 4-ER-671-76; 2-SER-496-520, 565-74, 3-SER-581-613, 648-89, 697-790; 4-SER-959-60, 991-95.

The declarations establish that the tap water is discolored and foul-tasting, 3-SER-788-89-¶ 66; 4-SER-991-¶ 8, the drinking water is filled with contaminants, 3-SER-592-¶ 39; 3-SER-741-42-¶ 18; 3-SER-758-¶ 39, and the containers providing drinking water are often empty. The record further shows that Adelanto serves spoiled, undercooked, non-nutritious food, 3-SER-786-88-¶¶ 56-64; 3-SER-766-¶ 6, in very small portions, 3-SER-787-88-¶ 61; 3-SER-612-¶ 13. It shows that soap is inconsistently available, 3-SER-786-¶ 54; 3-SER-593-¶ 44, the facilities remain unsanitary—mold grows on the walls and rodent droppings appear in the cafeteria where detainees eat—and in parts of the facility, there is no privacy for toilets and showers and clothing and bedding remain threadbare, worn, and not temperature-appropriate. 3-SER-766-71-¶¶ 6, 31, 36; 3-SER-581-94-¶¶ 10, 34, 45-46; 3-SER-742-¶ 21; 4-SER-959-¶¶ 23-24; 3-SER-785-89-¶¶ 53-56, 65-68. In a June 2025 press release, members of Congress condemned these "inhumane" conditions. 5-SER-1021.

Detainees also lack social interaction and stimulation. They remain locked in their cells more than five times a day for an hour at a time while staff conduct head counts. 3-SER-758-¶ 40; 3-SER-790-¶ 74. They receive as little as one hour of outdoor recreation per day. 3-SER-670-¶ 27; 3-SER-789-¶¶ 69-70. And visits with their loved ones are severely limited in time and physical contact. 3-SER-594-¶¶ 47-48; 3-SER-672-¶¶ 35-37. When detainees speak about these conditions, staff punish them with solitary confinement. 3-SER-668-69-¶¶ 20-22; 3-SER-759-60-¶¶ 46-50. ICE's own data shows it placed ninety-five people at Adelanto in solitary confinement during November 2025, and eighty-nine during October 2025. In solitary confinement, detainees cannot leave their small cells, except for thirty to sixty minutes to get water, warm food, make a phone call, shower, or go outside in a small, caged yard that smells like urine. During this limited outdoor time, detainees cannot drink water or use the bathroom. 3-SER-760-¶¶ 48-49.

Plaintiffs' expert, William Adams, found that these conditions are harsher than prison conditions and serve no legitimate penological purpose. 3-SER-336-¶ 22. Detainees believe, consistent with the Government's representations, that these conditions are designed to coerce them into agreeing to deportation. 3-SER-591-¶ 37; 4-SER-673-¶ 21.

### 3. Disability Accommodations

Adelanto also lacks an effective system for identifying and accommodating disabilities, including providing adaptive equipment and services. 2-SER-424-36-¶¶ 17, 23-25, 56; 2-SER-496-500-¶¶ 9, 24-26, 30 (detainee with arthritis and osteoporosis denied a wheelchair); 3-SER-591-¶ 37 (elderly individual denied walker); 3-SER-684-86-¶¶ 18-19, 24 (individual with brain tumor and elderly individuals assigned upper bunk); 3-SER-741-¶ 14 (wheelchair user reliant on other detainees to attend meals); 4-SER-955-57-¶¶ 10, 13-17 (individual with post-stroke mobility issues assigned second floor housing, denied shower bench and sleep apnea machine, chained and dropped on face during transport); 3-SER-785-¶ 51 (epileptic individual assigned top floor housing); 4-SER-946-47-¶ 7 (dietary accommodations for diabetics denied); 3-SER-708-09-¶ 33 (individuals with canes, back problems, mobility issues assigned upper bunk); 3-SER-697-¶ 20 (denial of prescribed orthopedic shoes for over one year); 3-SER-726-¶ 14 (elderly man with dementia urinating self, left unassisted by staff); 1-SER-39-124. For example, staff assign detainees with clear mobility issues top bunks and cells on the second floor, 4-SER-955-56-¶ 10; 3-SER-708-09-¶ 33, detainees who struggle to stand do not receive shower chairs, 4-SER-956-¶ 12, and detainees with diabetes are not given special shoes, 3-SER-647-¶ 18.

## E. Prior Proceedings

### 1. The Preliminary Injunction Proceedings

On January 26, 2026, Plaintiffs sued the Government for violations of the Fifth Amendment, the Rehabilitation Act, and the Administrative Procedure Act.[1] 5-ER-912. Plaintiffs then moved for a preliminary injunction in March 2026. 5-ER-916. The district court denied that motion without prejudice, finding the requested relief too broad before class certification. 4-ER-846-58.

Plaintiffs subsequently filed their First Amended Complaint on May 22, 2026, which maintained the same claims but added facts about ICE's control over GEO. 4-ER-744-53-¶¶ 176-216. Plaintiffs concurrently renewed their class-certification motion and on June 1, 2026, Plaintiffs renewed their motion for preliminary injunction. 5-ER-922-23.

On July 16, 2026, the district court granted Plaintiffs' renewed preliminary-injunction motion and certified a class of all current and future Adelanto detainees and a disability subclass. 1-ER-44-51. Among other things, paragraphs 1-4 of the injunction require continuous access to potable water; nutritious, sanitary meals; daily cleaning and mold remediation; restroom and shower privacy; and clean, temperature-appropriate clothing and bedding; four hours of daily outdoor recreation; and physical contact during visitation. 1-ER-45-47. It limits headcounts

[1] Plaintiffs' Administrative Procedure Act claim is not at issue in this appeal.

to two counts by day and two by night and restricts administrative segregation. *Id.* The injunction also requires the Government to develop a remedial plan for medical care and disability accommodations and appoints two independent Monitors: a Medical Monitor and a Conditions Monitor. *Id.* at 47-48.

### 2. The First Appeal

On July 30, 2026, the Government appealed, 5-ER-893; the district court denied the Government's motion to stay, 2-ER-255; and the Government moved for a stay in this Court, *L.T. v. U.S. Immigr. & Customs Enf't*, No. 26-4902, Dkts. 3, 4.1 (9th Cir. July 31, 2026). On August 6, 2026, this Court administratively stayed the injunction pending issuance of the district court's statement of reasons. *L.T. v. U.S. Immigr. & Customs Enf't*, No. 26-4902, Dkt. 15.1 (9th Cir. Aug. 6, 2026).

The district court issued its statement of reasons on August 12, 2026, detailing the inadequate medical care and inhumane conditions at Adelanto, as described above, *supra* at 8-17. 1-ER-2-43. On August 20, 2026, this Court lifted the administrative stay and denied the Government's stay pending appeal because, among other things, the Government had not shown a likelihood of success on its standing arguments or on the merits and had not shown irreparable harm. Order Denying Stay.

### 3. Clarifications to the Preliminary Injunction

On August 27, 2026, Plaintiffs moved ex parte to be heard so that the parties and Monitors could address (1) what steps, if any, the Government had taken to comply with the injunction and (2) the Monitors' duty to file reports. 2-ER-226. The next day, the Government opposed Plaintiffs' request. 2-ER-177-200. After receiving the Government's opposition brief, the district court modified the injunction to specify the deadlines for the Monitors' reports, to clarify that the Government must provide facility access to the Monitors and those assisting them, and to explain the procedures for ex parte communications between the Monitors and the court, counsel, and class representatives, respectively. 1-FER-22-25.[2]

On September 1 and 4, 2026, the district court heard argument. At the September 1 hearing, the district court explained that its amendments would clarify how the Monitors could communicate with the court and counsel, without adjudicating any violations of the preliminary injunction. 2-ER-109-10. On September 2, the court circulated a redlined tentative amended injunction reflecting the hearing and its discussions with the Monitors. 2-ER-154-61. At the September 4 hearing, the court considered the Government's objections to the tentative, including objections to remote records access, the use of inspection equipment

[2] "FER" refers to the Excerpts of Record that Defendants filed with their second brief, No. 26-6685, at Dkt. 13.2 and Dkt. 13.3.

(specifically, a camera), and the comment system. 2-ER-54-101. The Government agreed that the Conditions Monitor could use her camera. 2-ER-75-78.

After the parties jointly proposed a detainee comment system to replace the grievance procedure, *see* 2-FER-161; 2-SER-304-06, the district court entered its First Amended Preliminary Injunction, 1-FER-3-11. The First Amended Preliminary Injunction preserves the July 16 injunction's substantive requirements while clarifying the following terms:[3]

| Initial Injunction Order (1-ER-44-51) | First Amended Injunction (1-FER-3-21) |
|---|---|
| **Inspections**. Permits unannounced inspections and reasonable access to the facility, staff, detainees, and records. ¶ 5(d). | Requires access for assisting personnel and permits inspection equipment, like cameras (which the Government agreed to), and accompaniment by Court staff or Marshals "as needed." ¶ 5(d). |
| **Electronic records.** Reasonable access to relevant physical and electronic health records. ¶ 5(d). | Monitors must have read-only, 24/7 access (on-site or remote) to any electronic records that will help facilitate duties. ¶ 5(f). |
| **Facility entry.** Access sufficient to conduct unannounced inspections. ¶ 5(d). | Expedited security screening and entry within ten minutes, subject to applicable security protocols. ¶ 5(d). |
| **Detainee comments.** Free physical and electronic channels for detainees to communicate directly with monitors. ¶ 5(f). | Refines the grievance mechanism into a comment system and establishes procedures for collecting and transmitting comments through Plaintiffs' counsel, as stipulated by the parties. ¶ 5(h). |

[3] Plaintiffs only identify the modifications the Government takes issue with.

| | |
|---|---|
| **Monitoring scope.** Independent monitoring of medical care, disability accommodations, and conditions of confinement, including review of the remedial plan. ¶ 5. | Expressly includes compliance with paragraphs 1-4, *i.e.*, the substantive obligations. ¶ 5. |
| **Communications with court.** Communicate with court and parties through monthly reports detailing their findings and recommendations. ¶ 5(c). | Permits ex parte communications between the Court and Monitors regarding any issue arising under or relating to the preliminary injunction. ¶ 5(j). |

#### 4. Orders to Show Cause

Despite the First Amended Preliminary Injunction, the Monitors continued to encounter access barriers. On September 15, the district court ordered the Government to show cause why it had not provided remote access to the Medical Monitor or permitted the Conditions Monitor to use her camera. 2-ER-103-05. After the Government provided remote access, the district court discharged the order to show cause without sanctions. 2-FER-150.

But access problems persisted. In his October 1 report, the Medical Monitor reported that inadequate access to records and the facility prevented him from assessing medical care. 2-FER-148-149. The Conditions Monitor described being held in the lobby and barred from using her camera. 2-FER-142-43. The district court ordered production of outstanding photographs by October 13 and remote access to additional records modules by October 16, with daily status reports and potential sanctions of $500 per day. 2-FER-41, 58-59. The photographs were

delivered by October 12. 2-FER-92. On October 15, the court warned that sanctions would begin at 5:01 p.m. on October 16 if the outstanding access issues were not resolved. 2-FER-37. On October 16, the Government reported that GEO's record vendor did not expect to complete the permissions necessary for remaining access until November 3. 2-FER-30-36. No sanctions were issued.

#### 5. The Second Appeal

On October 9, 2026, the Government appealed the district court's modification orders to the preliminary injunction and sought a stay pending appeal. 2-FER-165. This Court consolidated that appeal with the Government's first appeal. *L.T. v. U.S. Immigr. & Customs Enf't*, No. 26-4902, Dkt. 32.1 (9th Cir. Oct. 11, 2026). On October 13, this Court denied the Government's administrative stay. *L.T. v. U.S. Immigr. & Customs Enf't*, No. 26-4902, Dkt. 33 (9th Cir. Oct. 13, 2026). And on October 21, this Court denied the Government's remaining stay motion, finding that the Government had not shown a likelihood of success on the merits or irreparable harm. Second Stay Order.

## SUMMARY OF ARGUMENT

**I.** The district court correctly found that Plaintiffs established injury-in-fact, traceability, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

**A.** Plaintiffs face concrete, ongoing harms. The district court correctly rejected the Government's argument that the departures of J.M. and Sevak Mesrobian undermine Plaintiffs' showing of harm. Because the harms are "certain[] [to] repeat as to the class," *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1090 (9th Cir. 2011), and transitory, this is a paradigm "relation back" case where the merits are preserved for judicial resolution, *County of Riverside v. McLaughlin*, 500 U.S. 44, 52 (1991). Moreover, L.T., Salazar Garza, and CHIRLA members remain detained at Adelanto, where they face inadequate medical care and punitive conditions.

**B.** The district court correctly found Plaintiffs' injuries fairly traceable to ICE. ICE maintains significant control over GEO and has the means to remedy constitutional and statutory deficiencies at Adelanto. The Government does not dispute this oversight. It instead argues it does not matter.

But that ignores the traceability standard and the thrust of Plaintiffs' redress. As the district court correctly understood, Plaintiffs seek to hold the Government responsible for its ***own*** failure to provide constitutional conditions by allowing known deficiencies to persist. Plaintiffs' injuries thus trace to ICE's own failures, not merely GEO's conduct.

ICE cannot escape its constitutional duties by contracting with GEO. As the Supreme Court held, "contracting out prison medical care does not relieve the State

of its constitutional duty to provide adequate medical treatment to those in its custody." *West*, 487 U.S. at 56; *see also Rawson,* 975 F.3d at 753 (holding that the government retains "a Fourteenth Amendment obligation toward those whom it has ordered involuntarily committed" in a private facility). The Government's cases address vicarious liability under the Federal Tort Claims Act, not ICE's independent constitutional obligations. *See Logue v. United States*, 412 U.S. 521, 526-33 (1973) (rejecting vicarious liability for county jail employees' negligence but remanding to consider a federal marshal's own negligence); *United States v. Orleans*, 425 U.S. 807, 813-16 (1976) (rejecting vicarious liability for employees of a federally funded nonprofit whose daily operations the Government did not control).

**C.** Plaintiffs also establish redressability. As the district court correctly found, the Government can force GEO to correct the conditions through its oversight or by withholding payment, terminating the contract, or relocating detainees.

The Government incorrectly demands proof that these measures will "certainly" redress Plaintiffs' injuries. But redress need only be *likely*. *E.g.*, *Murthy v. Missouri*, 603 U.S. 43, 57-58 (2024). That is certainly met where, as here, the Government has successfully exercised these levers in the past to correct deficiencies at Adelanto.

The Government's objection under 8 U.S.C. § 1252(f)(1) fails because the district court identified relocation as a possible means of compliance, not a requirement.

**II.** The Government incorrectly argues that CHIRLA lacks standing because it fails to directly name a member. As the district court correctly held, and as this Court already explained, *Vasquez Perdomo v. Noem* does not require naming where, as here, there is a threat of adverse action and the particular identities are not necessary to understand and respond to an organization's claim of injury. 148 F.4th 656, 676 (9th Cir. 2025).

**III.** The district court did not abuse its discretion in granting a preliminary injunction because Plaintiffs established likelihood of success, irreparable harm, favorable equities, and the public interest. *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

The Government incorrectly seeks heightened scrutiny by labeling the injunction mandatory. But the injunction prohibits the Government from permitting unconstitutional detention conditions—a classic prohibitory injunction. *Hernandez v. Sessions*, 872 F.3d 976, 998 (9th Cir. 2017). Even under heightened scrutiny, the harms are "extreme [and] very serious" and the merits are not "doubtful." *Id.* at 999.

**A.1.** The district court correctly found that Plaintiffs are likely to succeed on their medical conditions claim. Under *Gordon v. County of Orange*, Plaintiffs must

show (1) an intentional decision concerning confinement conditions, (2) a substantial risk of serious harm, (3) failure to take reasonable available measures despite an obvious risk, and (4) resulting injuries. 888 F.3d 1118, 1125 (9th Cir. 2018). The district court correctly found all four factors satisfied.

*First*, ICE contracted with GEO to operate Adelanto and allowed known medical deficiencies to persist despite at least ten warnings. That inaction may constitute an intentional decision. *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1071 n.4 (9th Cir. 2016). *Second*, the undisputed record establishes a substantial risk of serious harm, which the Government does not contest.

*Third*, the record demonstrates the Government "did not take reasonable available measures" and acted with reckless disregard. All twenty-five declarations share a common thread—at Adelanto, medical emergencies are ignored, medication is not properly administered, and detainees must wait months to receive medical care, if they even receive it at all. The Government knew this from its monitoring but did nothing in response, showing reckless disregard. That the Government does not like the district court's finding does not mean the court assigned the monitoring improper weight. *Fourth*, the conditions are so atrocious, they easily show imminent harm.

**A.2.a.** The district court correctly found that Plaintiffs are likely to succeed on their punitive conditions claim. In *Fraihat*, 16 F.4th at 647-48, this Court

extended *Jones v. Blanas*, 393 F.3d 918, 933 (9th Cir. 2004) to the immigrant-detainee context. This Court should also extend *Jones*' presumption—that conditions are punitive where they are "identical to, similar to, or more restrictive than those under which pretrial criminal detainees are held," 393 F.3d at 934—to the immigrant-detainee context, since the same constitutional principles apply.

The presumption applies. Unrebutted evidence shows the conditions are worse than prison—detainees are deprived of basic necessities, subjected to excessive restrictions on recreation and family contact, and punished with solitary confinement. The Government must therefore show that the conditions are legitimate and not excessive, which it cannot do.

**A.2.b.** Even if the *Jones* presumption does not apply, ample record evidence shows that at Adelanto, conditions are unconstitutionally punitive because they are (1) "intended to punish," (2) "excessive in relation to [their] non-punitive purpose," or (3) "employed to achieve objectives that could be accomplished in so many alternative and less harsh methods." 393 F.3d at 932. As the district court correctly found, Plaintiffs are likely to succeed on each of these independent bases.

*First*, statements from the Government—that the conditions are intentionally harsh to deter immigration—show the conditions are "intended to punish." *Second*, unrebutted expert testimony establishes that depriving detainees of basic necessities serves no legitimate purpose, making the conditions excessive. *Third*, the

Government's own detention standards and ordinary prison practices demonstrate that security objectives can be achieved through less restrictive means.

**A.3.** The district court correctly found that Plaintiffs are likely to succeed on their Rehabilitation Act claim because they: (1) are "qualified individual[s] with a disability; (2) [were] denied a reasonable accommodation;" and (3) the program is conducted by an executive agency. *Csutoras v. Paradise High School*, 12 F.4th 960, 968-69 (9th Cir. 2021) (cleaned up).

The Government incorrectly argues that the district court had to find the accommodations were denied "solely" because of Plaintiffs' disabilities. Section 504 imposes "an affirmative obligation" to make programs accessible, *Updike v. Multnomah Cnty.*, 870 F.3d 939, 949 (9th Cir. 2017). The Government also retains its statutory obligations despite its contract with GEO.

**B.** For the same reasons they are likely to succeed on the merits, irreparable harm favors Plaintiffs. "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Hernandez*, 872 F.3d at 994 (quoting *Melendres v. Arpaio*, 699 F.3d, 990, 1002 (9th Cir. 2012)).

**C.** Likewise, the balance of equities favors Plaintiffs. It is always in the public interest to "prevent the violation of … constitutional rights." *Melendres*, 699 F.3d at 1002.

**IV.** The district court retained jurisdiction to clarify the Monitors' duties while the Government appealed. Rule 62(d) permits a district court to preserve its injunction's effectiveness and supervise compliance without materially altering the case on appeal. The challenged modifications did precisely that. They left unchanged the substantive requirements governing detention conditions, medical care, and disability accommodations, while specifying how the already-appointed Monitors would assess compliance through facility and records access, detainee communications, and reporting to the court. As in *Natural Resources Defense Council, Inc. v. Southwest Marine, Inc.*, 242 F.3d 1163, 1166 (9th Cir. 2001) and *Meinhold*, 34 F.3d at 1480 n.14, the modifications implemented existing obligations without materially changing the case on appeal.

**V.** The preliminary injunction (the "Decree") is lawful in form and scope. It satisfies Rule 65(d), reserves judicial authority to the district court, and leaves the Government in control of Adelanto's operations.

**A.** Rule 65(d)(2) permits injunctions to bind parties and their agents. *Sequoia Dist. Council of Carpenters*, 568 F.2d 628, 633-34 (9th Cir. 1977). GEO operates Adelanto for ICE, which retains contractual authority to secure GEO's cooperation. ICE has already exercised that authority to expand medical staffing, improve intake screening, and give the Monitors access to records. 2-ER-122-25,

154-55. The Government cannot challenge hypothetical contempt sanctions: the district court has imposed none.

**B.** Rule 65(d)(1) requires reasonable specificity, not step-by-step instructions for compliance. *Fortyune*, 364 F.3d at 1087. The Decree sets concrete requirements for water, sanitation, medical care, recreation, and other detention conditions. 1-FER-3-6. This Court has already recognized that these requirements provide "specific directives with which to comply." Order Denying Stay at 5.

**C.** The remedial-plan provision does not violate Rule 65(d)(1)(C), which bars injunctions from defining required acts by reference to another document. The Decree itself specifies the medical care and disability accommodations ICE must provide. The plan addresses how ICE will meet those requirements, subject to judicial approval, which is permissible. *Melendres v. Skinner*, 113 F.4th 1126, 1139-40 (9th Cir. 2024).

**D.** The Decree does not delegate judicial authority to the Monitors. Courts may appoint Monitors to investigate compliance and recommend corrective measures, but must retain ultimate authority. *Armstrong v. Brown*, 768 F.3d 975, 987-88 (9th Cir. 2014). Here, the Monitors inspect, investigate, and report. They cannot adjudicate violations or impose binding obligations. As this Court found, "any recommendations made by the monitors must be adopted by the district court before they become effective." Order Denying Stay at 5.

**E.** The Government received notice and an opportunity to be heard. Due process permits courts to consider Monitors' findings when the parties can respond before the court adjudicates compliance. *Armstrong*, 768 F.3d at 987-88. The district court circulated the proposed modifications, considered the Government's objections, and revised the provisions to accommodate its security protocols and records systems. 1-FER-8; 2-ER-55-56, 64-88. The Government identifies no ruling based on undisclosed evidence it could not challenge.

**F.** Finally, the Decree respects separation of powers. Courts may remedy constitutional violations even when relief requires changes to executive operations. *Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 861 (9th Cir. 1992), *as amended on denial of reh'g* (Aug. 25, 1992). The Government retains operational control of Adelanto, while the Monitors assess compliance and report to the court. The Decree enforces constitutional limits without transferring executive authority to the judiciary.

**VI.** The district court correctly certified the Adelanto Class and Disability Subclass under Rule 23. As this Court has repeatedly held, systemic health-care and conditions-of-confinement claims are well suited to class treatment. *Parsons v. Ryan*, 754 F.3d 657, 676-89 (9th Cir. 2014) ; *Roman*, 977 F.3d at 944-45.

**A.** 8 U.S.C. § 1252(f)(1) does not bar classwide relief. The injunction does not restrain the Government's authority under § 1231(g) to choose the "appropriate

places of detention"; it requires only that Adelanto comply with the Constitution and the Rehabilitation Act. That relocation is one possible means of compliance is, at most, a "collateral effect" that § 1252(f)(1) permits. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 553 n.4 (2022). And Plaintiffs assert Fifth Amendment and Rehabilitation Act claims, not a claim to enforce § 1231(g).

**B.** Rule 23(a)'s prerequisites are satisfied. The Government's own figures show 1,592 detainees and 74 receiving disability accommodations, easily establishing numerosity. Commonality is met because every class member's claims turn on the same facility-wide systems—the same water, kitchen, and intake, sick-call, and emergency systems—which can be resolved "in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). And the district court expressly considered typicality and adequacy, correctly finding that shared exposure to Adelanto's deficient systems makes Plaintiffs' claims typical and that Plaintiffs and counsel have no conflicts with the class.

**C.** Rule 23(b)(2) certification was proper. An order requiring safe drinking water, a functioning sick-call system, sanitary food, and lawful use of restrictive housing benefits every current and future detainee at Adelanto. *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998).

*Trump v. CASA, Inc.*, 606 U.S. 831 (2025) does not apply; it addressed universal injunctions for nonparties, not certified classes, and did nothing "to disrupt Rule 23's requirements." *Id.* at 868 (Alito, J., concurring).

## STANDARD OF REVIEW

This Court reviews preliminary injunctions and class certification decisions for abuse of discretion. *Washington v. Trump*, 145 F.4th 1013, 1021-22 (9th Cir. 2025); *Parsons,* 754 F.3d at 673.

This Court reviews *de novo* questions of jurisdiction, Rule 65(d) compliance, Article III standing, and statutory interpretation. *Nat. Res. Def. Council, Inc. v. Sw. Marine, Inc.*, 242 F.3d 1163, 1166-67 (9th Cir. 2001); *Premier Commc'ns Network, Inc. v. Fuentes*, 880 F.2d 1096, 1100 (9th Cir. 1989); *Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 635 (9th Cir. 2021).

Factual findings are reviewed for clear error. *Fraihat*, 16 F.4th at 635. Clear error is a "significantly deferential test that [asks] whether the district court reache[d] a result that is illogical, implausible, or without supporting inferences." *U.S. v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009).

## ARGUMENT

### I. PLAINTIFFS HAVE ARTICLE III STANDING.

To establish Article III standing, plaintiffs must show: (1) an injury-in-fact, (2) that is fairly traceable to a defendant's conduct, and (3) that a favorable decision

would likely redress. *Lujan*, 504 U.S. at 560-61. The district court correctly found all three elements satisfied.

### A. Plaintiffs Have Established Concrete, Ongoing Harms.

The district court correctly concluded that Plaintiffs' claims are ripe because their harms are ongoing, "real and concrete," and likely to reoccur. 1-ER-27-28; *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). Restyled as a harm argument, the Government argues that Plaintiffs lack standing because two Plaintiffs—J.M. and Mesrobian—have left Adelanto. Br. 29.

The district court correctly rejected this argument. 1-ER-27-28. *First*, J.M. and Mesrobian suffered transitory harms "certain[] [to] repeat as to the class." *Pitts*, 653 F.3d at 1090. The record shows this, 2-SER-517-19; 3-SER-586-87, 714-16, 725, 774-82; 4-SER-958, making this a paradigm "relation back" case, *e.g.*, *McLaughlin*, 500 U.S. at 52; *U.S. Parole Commission v. Geraghty*, 445 U.S. 388, 402 n.11 (1980).

*Second*, Salazar Garza and L.T. remain detained at Adelanto, as do CHIRLA's members (*see infra* II), where they face inadequate medical care and punitive conditions—a point the Government does not dispute.

### B. Plaintiffs' Harms Are "Fairly Traceable" to the Government.

At the preliminary injunction stage, plaintiffs must make a "clear showing" that they are "likely" to establish traceability. *Murthy v. Missouri*, 603 U.S. 43, 58

(2024). To do so, plaintiffs must show that their harm is "fairly traceable" to the defendant and "not the result of the independent action of some third party." *Bennett v. Spear*, 520 U.S. 154, 167 (1997).

Traceability "may be found even if there are multiple links in the chain connecting the defendants' unlawful conduct to the plaintiff's injury." *Mendia v. Garcia*, 768 F.3d 1009, 1012 (9th Cir. 2014). Where, as here, a plaintiff alleges that government action caused injury by influencing the conduct of a third party, all a plaintiff must do is establish that by "particular facts." *Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 849 (9th Cir. 2002).

The district court correctly found that Plaintiffs established traceability. ICE maintains significant control over GEO. It oversees GEO's "performance and adherence to ***all*** contractual requirements," namely, the PBNDS. *See supra* at 6 (emphasis added). It employs a DSM and a Contracting Officer Representative to ensure compliance. *See supra* at 6-8. It must implement any corrective action the DSM identifies. *See supra* at 6-8. And it is congressionally mandated to inspect facilities, like Adelanto, and hold "detention facility contractors accountable for not meeting performance standards." 4-ER-706-¶ 54-55. It thus has the means to remedy constitutional and statutory deficiencies at Adelanto.

The Government does not dispute this oversight. It instead argues that it does not matter. Fashioning a four-part test, the Government contends Plaintiffs must

connect ICE's failure to oversee GEO to a discrete injury; show the failure is a "substantial factor motivating" GEO's actions; show GEO's choice not to comply was a product of "coercion;" and demonstrate the causal links without guesswork. Br. 19-21.

Putting aside that the Government largely pulls these "standards" from dicta[4] or nonapplicable cases,[5] none prohibit traceability where, as here, a plaintiff seeks to hold the Government responsible for its ***own*** misconduct that directly influenced the conduct of a third party. *Cf.* Br. 21-22. Indeed, and as the district court correctly understood, Plaintiffs seek to hold the Government responsible for allowing the unconstitutional conditions at issue—conditions it knows about, *see supra* at 8-9, and that it controls through its statutory and contractual oversight, indisputably making it part of the causal chain. 1-ER-21.

For this reason, the Government's reliance on *Murthy*, 603 U.S. 43, is misplaced. There, the plaintiffs sought to hold federal officials responsible for content-moderation decisions made by independent social-media platforms exercising their own editorial discretion. The Court found traceability lacking

---

[4] For example, in *Murthy*, 603 U.S. 43, 59, the Supreme Court did not require specific causation findings. It identified the lack of specific causation findings as a weakness in the record.

[5] *Blum v. Yaretsky*, 457 U.S. 991, 1004-05 (1982), addressed when private conduct constitutes state action, not whether injuries are traceable to the Government's own failure to fulfill its constitutional, statutory, and contractual obligations. Its coercion-or-encouragement standard is therefore inapposite.

because the plaintiffs had not adequately established that the challenged moderation decisions resulted from government coercion or encouragement rather than independent judgments. *Id.* at 57-67. Here, by contrast, GEO does not act independently, it is directly controlled by ICE. *See supra* at 6-8. As such, traceability is easily established.

Further, as the entity detaining Plaintiffs, the Government bears a constitutional obligation to provide for their "basic human needs," including "food, clothing, shelter,[and] medical care." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989). This Court has already agreed that precedent forbids the Government from abdicating this duty and passing it onto GEO. Order Denying Stay at 2 (citing *West v. Atkins*, 487 U.S. 42, 56 (1988) ("Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody...."); *Rawson*, 975 F.3d at 753 (holding that the government retains "a Fourteenth Amendment obligation toward those whom it has ordered involuntarily committed" in a private facility)); *see also Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1074 (9th Cir. 2010) (government entities "cannot shirk … obligations ... under federal law by housing [plaintiffs] in facilities operated by [third-parties]"); 8 U.S.C. § 1231(g)(1) (DHS must "arrange for appropriate places of detention").

The Government's attempt to distinguish *West* and *Rawson* misses the mark.[6] It is irrelevant that neither addressed Article III standing. Br. 23. The legal proposition—that the Government cannot delegate its constitutional duties to a contractor—holds true in any context. Both expressly require the Government to also remain responsible and an avenue for plaintiffs to seek redress, thus establishing that Plaintiffs' constitutional and statutory harm is *also* traceable to the Government. *See West*, 487 U.S. at 56; *Rawson*, 975 F.3d at 753. Said differently, through its oversight, the Government remains a link in the chain through which harm flows, thereby establishing traceability. *See Matsumoto v. Labrador*, 122 F.4th 787, 799-

[6] The Government attempts this same argument to rebut the merits. Br. 33-35. Cobbling together inapplicable cases, *e.g.*, *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 74 (2001) (declining to extend *Bivens* to corporate defendants); *Minneci v. Pollard*, 565 U.S. 118, 128 (2012) (federal prisoner cannot bring *Bivens* action against private prison for constitutional violations when state law provides alternative remedies), the Government urges Plaintiffs must sue their "jailer,"—GEO, who "holds the keys to conditions." *Id.* at 34.

But GEO is not the "jailer," *ICE is*. The Government admits as much, conceding that *ICE*, not GEO, holds detainees in "legal custody." *Id.* at 34; *see also* 8 U.S.C. § 1226(a) (permitting the Government to arrest and detain noncitizens pending removal proceedings); *Geo Grp., Inc. v. Newsom*, 50 4th 745, 750 (9th Cir. 2022) ("ICE carries out extensive detention operations[.]"). Under *Rumsfeld v. Padilla*, 542 U.S. 426 (2004), the primary case on which the Government relies, that means ICE is the proper respondent because it is the "person who has custody over the petitioner" and who has the "power to produce the body … before the court or judge." *Id.* at 435-36. And regardless, even accepting the Government's theory, ICE maintains significant supervisory authority over GEO and has the power to alter the conditions at Adelanto through this authority, meaning it also "holds the key to the conditions."

801 (9th Cir. 2024) (finding traceability to Attorney General notwithstanding independent county prosecutors' possible intervening decisions). Any other rule would allow the federal government to contract out its constitutional responsibilities of care in limitless form and shirk all constitutional responsibility purely by engaging private actors.

The Government errantly relies on *Logue v. United States*, 412 U.S. 521 (1973), and *United States v. Orleans*, 425 U.S. 807 (1976). Both decided whether a contractor's employees were federal employees, which would have made the United States vicariously liable under the FTCA for their negligence. *Logue*, 412 U.S. at 529-30; *Orleans*, 425 U.S. at 814-16. Neither held that the Government is relieved of its responsibility to provide detainees with constitutional conditions.

**C. The Injunction Redresses Plaintiffs' Harms.**

Article III requires a "likelihood that a plaintiff's injury will be redressed by a favorable court decision," a "relatively modest" burden, *Tuscon v. City of Seattle*, 91 F.4th 1318, 1325 (9th Cir. 2024), that requires showing a "substantial likelihood" of redressability. *M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018).

The district court correctly held that Plaintiffs meet this threshold. 1-ER-22-24. As the district court properly found—and as this Court agreed—the Government can accomplish the injunction's requirements through its contractual and

constitutional oversight or by "withholding payment, terminating [the] contract, or relocating the detainees to another facility." 1-ER-22-23; Order Denying Stay at 3.

The Government gets matters backwards in faulting the district court for relying on these "levers" to find redressability, asserting that "neither changes a single condition inside Adelanto." Br. 26. As the Government acknowledges, ICE is able to issue deficiency reports to GEO, require correction, inspect to verify correction, and withhold payment or terminate for failure to correct. Br. 11. The Government's own brief describes the successful use of these oversight procedures—in September 2025, after an inspection identified six deficiencies, ICE notified GEO and GEO completed corrective actions. Br. 11-12. This dooms the Government's argument that it is unable to control GEO and alter the conditions at Adelanto.

In any case, the Government misstates the showing required for redressability. The Government demands certainty, contending that Plaintiffs have not shown exercise of the "levers" is guaranteed to change the conditions at Adelanto. But all Plaintiffs must show is a *likelihood* of redressability, *e.g.*, *Murthy*, 603 U.S. at 57-58 ("[P]laintiffs must show that the third-party platforms will likely react in predictable ways to the defendants' conduct.") (cleaned up), which is easily established through ICE's oversight power and ability to correct prior deficiencies, *e.g.*, *Matsumoto*, 122

F.4th at 801-02 (court need only provide a "small incremental step" to reduce the risk of harm).

Failing to advance its claim, the Government spends pages arguing Section 1252(f)(1) prevents the district court from ordering detainees be relocated from Adelanto. Br. 27-29. This is a nonissue. *See infra* VI.A. The district court's point was merely that the Government could threaten to relocate detainees to force GEO to comply with its contractual obligations. It did not itself order detainees to be relocated, either on an individual or class-wide basis.

## II. CHIRLA HAS STANDING.

An association has standing to bring suit on behalf of its members when: "(a) its members would otherwise have standing to sue ... ; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

On appeal, the Government does not dispute that the district court correctly found the second prong satisfied. *Cf.* Br. 29-31. It instead argues CHIRLA fails at prong three because it does not name a member who has standing. Br. 31.

But as the district court correctly determined, 1-ER-27, and as this Court has already explained, *Vasquez Perdomo*, does not require naming where, as here, there is a threat of adverse action and the particular identities are not necessary to

understand and respond to an organization's claim of injury. 148 F.4th at 676. Just as in *Vasquez Perdomo v. Noem*, the "ongoing [and likely future] pattern of unconstitutional" conduct "does not require the participation of individual members." *Id.* at 677; *see also NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 459 (1958) (NAACP had standing to assert constitutional rights of members). Likewise, the intense fear of retribution has prevented detainees from actively participating in the lawsuit. *See* 3-SER-727-¶ 20 (fear of advocating for detainees' rights given retaliatory use of solitary housing). Further, Plaintiffs seek prospective injunctive relief (not damages), again making individual participation unnecessary. *See, e.g.*, *Columbia Basin Apartment Ass'n v. City of Pasco*, 268 F.3d 791, 799 (9th Cir. 2001) (claims for injunctive relief "do not require individualized proof" of harm).

In response, all the Government can do is call *Vasquez Perdomo* bad law. Br. 31. Not so. The Supreme Court's stay of the injunction in *Noem v. Vasquez Perdomo*, 146 S. Ct. 1 (2025), says nothing about associational standing. No more persuasive is the footnote in *Arizona Alliance for Retired Americans v. Mayes* that the Government identifies. 186 F.4th 622, 630 n.1 (9th Cir. 2026). That merely recites the standard for associational standing, which does not, and in fact cannot under this Court's rules, overrule *Vasquez Perdomo*. *See Gonzalez v. Arizona*, 677 F.3d 383, 389 n.4 (9th Cir. 2012) (holding "law of the circuit" rule absolute).

## III. THE DISTRICT COURT CORRECTLY GRANTED THE PRELIMINARY INJUNCTION.

To obtain a preliminary injunction, Plaintiffs must establish that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) the "balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Winter*, 555 U.S. at 20. "Where, as here, the party opposing injunctive relief is a government entity, the third and fourth factors—the balance of equities and the public interest—'merge.'" *Hubbard v. City of San Diego*, 139 F.4th 843, 854 (9th Cir. 2025) (citation omitted).

At the threshold, the Government argues the district court applied the wrong standard because, in its view, the injunction is mandatory and subject to heightened scrutiny. Br. 33. But the injunction's order—that the Government must detain people in accordance with constitutional processes—is prohibitory: it prohibits the Government from permitting conditions likely to result in unconstitutional detention. This prevents future constitutional violations, a classic form of a prohibitory injunction. *See Hernandez*, 872 F.3d at 998.

Regardless, even if the higher mandatory injunction standard applies, the requirements are met here. *First*, unconstitutional detention certainly constitutes "extreme or very serious damage," that is not compensable in damages. *Id.* at 999 (unlawful detention constitutes "extreme or very serious" damage). *Second*, the merits of the case are not "doubtful"—Plaintiffs' likely success follows directly from

this Court's and the Supreme Court's dictate that the Government must provide constitutional conditions to immigrant-detainees, *id.* at 999, which it clearly is not, *see infra* III.A. Thus, under any standard, the preliminary injunction was proper, and this Court should affirm its issuance.

### A. Plaintiffs Are Likely to Succeed on the Merits of Their Claims.

#### 1. Adelanto's medical care violates the Fifth Amendment.

The Fifth Amendment requires the Government to provide conditions of reasonable health and safety to the people in its custody, including noncitizens. *DeShaney*, 489 U.S. at 199-200; *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001); *see also Doe v. Kelly*, 878 F.3d 710, 722 (9th Cir. 2017) ("There is no question that detainees are entitled to 'adequate medical care.'"). The Government violates this duty when:

> (i) [It] made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the [government] did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the [government's] conduct obvious; and (iv) by not taking such measures, the [government] caused the plaintiff's injuries.

*Fraihat*, 16 F.4th at 636 (quoting *Gordon*, 888 F.3d at 1125). For the third element, the conduct must be "objectively unreasonable," which is "something akin to reckless disregard." *Roman*, 977 F.3d at 943. For the fourth element, plaintiffs

"need only prove a sufficiently imminent danger, because a remedy for unsafe conditions need not await a tragic event." *Id.*

The district court correctly found all four factors satisfied.

*First*, the Government intentionally established the medical care standards at Adelanto through its contract with GEO by dictating that the care must comply with the PBNDS. *See supra* at 5-6 (detailing GEO's responsibility to provide specific medical care); 1-ER-3-4, 30-31. The Government does not dispute this. Instead, it argues that its decision to require compliance with the PBNDS shows that it made no decisions regarding the challenged conditions. Br. 35-36.

Not only does this concede the deficiency of the conditions—as they have to differ from the PBNDS for this argument to work—it ignores the record before this Court. On at least ten occasions, ICE was made aware of the medical deficiencies at Adelanto—either through its own investigation or the investigation of others. It did nothing in response, evincing an intentional decision to allow the medical conditions to persist. *Castro*, 833 F.3d at 1071 n.4 (failure to act with respect to a known condition "may constitute an intentional decision"); *Pastora by & through Toghraie v. Cnty. of San Bernardino*, 2023 WL 3734264, at *3 (9th Cir. May 31, 2023) (refusing to provide medical care satisfies intentionality standard).

*Second*, the undisputed record shows that the deficient medical care put Plaintiffs at substantial risk of suffering serious harm. As Dr. Saadi explained, after

reviewing the declarations, medical records, and other investigations, it became clear that at Adelanto (1) the medical intake and assessment processes fail to identify and treat medical conditions; (2) the sick-call system does not respond to medical requests in a timely manner; (3) detainees with chronic medical conditions do not receive timely or adequate care; (4) the system for administering prescription medication is dangerously ineffective; (5) specialty care is not provided; (6) staff does not respond to medical emergencies in a timely manner; and (7) detainees suffering from mental health issues are subject to conditions that worsen their mental health. 2-SER-423-65-¶¶ 14-148; *see also* 3-SER-682-87-¶¶ 5, 13-16, 18-19, 25-28, 30-31; 3-SER-776-83-¶¶ 13-39; 9-SER-954-59-¶¶ 6, 15-22. This is inadequate, *see Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982) *overruled in part on other grounds by Sandin v. Connor*, 515 U.S. 472 (1995) (Constitution requires officials provide a "system of ready access to medical care"), and the district court correctly found it caused Plaintiffs serious harm, 1-ER-31-32; *see, e.g.,* 3-SER-781-84-¶¶ 29, 45 (describing worsening epilepsy, including more frequent seizures, due to missed medication), 4-SER-957-¶¶ 15-16 (risk of heart attack and stroke increased by denial of sleep apnea machine, post-stroke mobility issues exacerbated by denial of cortisol shots). The Government does not dispute this, thereby waiving any objections. *See, e.g., Maloney v. T3Media, Inc.*, 853 F.3d 1004, 1019 (9th Cir. 2017) (issue not argued in briefs waived).

*Third*, the record amply supports the district court's finding that the Government acted with reckless disregard. All twenty-five declarations share a common thread—at Adelanto, medical emergencies are ignored, medication is not properly administered, and detainees must wait months to receive medical care, if they even receive it at all. *See supra* at 10-15; 2-SER-421-23-¶¶ 11-13. Relying on this record, the district court correctly found that the Government acted recklessly by failing to remedy these issues, which it should have identified and corrected through its monitoring. *See Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 670 (9th Cir. 2021) (minimal intervention by nurse following clear medical emergency showed reckless disregard).

The Government's response—that the district court's findings are clearly erroneous because they fail to account for the Government's monitoring—fails. Br. 36. The district court acknowledged the Government's monitoring, and used it to find reckless disregard and traceability. *See supra* I.B. The district court took issue with what the monitoring did not find, namely, the systematic deficiencies detailed across at least twenty-two declarations in the record. From this, it rightly concluded that the Government failed to properly monitor, thereby acting with reckless disregard—a completely logical finding. 1-ER-32; *see also Roman*, 977 F.3d at 943 (failure to remedy conditions despite known health risks reflects "reckless disregard for detainee safety"). That the Government does not like the district court's finding,

1-ER-32, does not mean the court assigned the monitoring improper weight. *E.g.*, *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 793 (9th Cir. 2005) ("Mere disagreement with the district court's conclusions is not sufficient reason … to reverse the district court's decision regarding a preliminary injunction.") (citation omitted).

Nor is the Government correct that the district court applied a negligence standard. Br. 37. The issue is not one of poor training, it is one of purposeful inaction. That inaction makes this case unlike *Fraihat*, 16 F.4th at 618-19, where ICE at least attempted to manage the COVID-19 outbreak through guidance documents and mandates. Here, the Government has done nothing.

*Fourth*, the record is replete with examples of the Government's inaction causing "sufficiently imminent danger" to Plaintiffs' health. The conditions are so atrocious that three detainees died and caused named Plaintiffs' health to worsen. 2-SER-318-28; 3-SER-781-84-¶¶ 29, 45. As the district court correctly noted, this is more than enough to find imminent danger—it need not wait for tragedy to strike. *Roman* 977 F.3d at 943 (remedy for unsafe conditions need not await a tragic event).

### 2. The Punitive Conditions at Adelanto Violate the Fifth Amendment.

#### a. The conditions are presumptively punitive.

A "presumption of punitive conditions" attaches where the "individual is detained under conditions identical to, similar to, or more restrictive than those under

which pretrial criminal detainees are held." *Jones v. Blanas*, 393 F.3d at 934. Once the presumption attaches, the burden shifts to the defendant to show "(1) legitimate, non-punitive interests justify[] the conditions of the detainee's confinement and (2) that the restrictions imposed are not excessive in relation to those interests." *Id.* at 935.

In *Fraihat*, this Court recognized that *Jones* applies to immigrant-detainees but declined to decide whether the *Jones* presumption also applies. *See* 16 F.4th at 647-48. It should. The presumption is not peculiar to California's civil commitment scheme. Rather, it derives from the fundamental constitutional distinction between civil confinement and criminal punishment: Because civil detainees have not been convicted of crimes warranting punishment, the government may not subject them to conditions that are punitive in purpose or effect. *Id.* at 931-32; *see also Bell v. Wolfish*, 441 U.S. 520, 535-39 (1979). That constitutional principle applies no less to immigration detainees, whose confinement likewise serves non-punitive purposes, like ensuring appearance at proceedings. It would be anomalous to presume that jail-like conditions are punitive when imposed on one category of civil detainees but deny that same presumption to immigration detainees subjected to equivalent restrictions.

At Adelanto, detainees are subject to harsher and more restrictive conditions than criminal prisoners, making the conditions presumptively unconstitutional.

It is indisputable that detainees are being deprived life's basic necessities—water is undrinkable and often not available; food is spoiled, rotten, and inadequate; clothes are dirty, foul-smelling, and thin; blankets and mattresses are dirty and thin; soap is inconsistently provided; and mold grows on the walls. 2-SER-519-20-¶¶ 26-27 (six hours to refill water); 3-SER-735-¶ 24 (dirty and brown sink water); 3-SER-592-¶ 39 (hair and slimy substance in drinking jugs); 3-SER-757-58-¶¶ 37-38 (insufficient food leading to eating from garbage); 3-SER-770-¶ 31 (wet and foul clothes after laundry); 3-SER-735-¶ 28 (mattress so thin detainees can feel the metal); 3-SER-593-¶ 44 (over one week without hand soap); 3-SER-648-¶ 24 (mold on walls).

And it is indisputable that detainees suffer inhumane day-to-day conditions—they lack privacy in the restrooms and showers; they are given only short, limited-contact visits with their loved ones; they are needlessly awoken and confined by excessive and disruptive headcounts; they get limited access to the outdoors; and solitary confinement is used to silence them. 3-SER-698-¶¶ 23, 25 (no curtains on toilets or showers); 3-SER-756-¶ 32 (no screens between showers that face each other); 3-SER-672-¶¶ 35-36 (cannot hold children at visits); 3-SER-709-10-¶ 38 (children kept apart from fathers during visits); 3-SER-726-¶16 (six disruptive counts per day); 3-SER-754-¶¶ 23-24 (one hour of outside time per day, but month without any at all); 3-SER-699-700-¶¶ 32-34 (sent to solitary confinement after

hunger strike); 3-SER-668-69-¶¶ 20-24 (eight occasions in solitary confinement for complaining about conditions); 2-SER-566-¶¶ 32-33 (five weeks of punishment for asking to see an officer).

Unrebutted expert testimony clearly establishes that these conditions are harsher and more restrictive than prison. 2-SER-336-38-¶¶ 22-29; 2-SER-350-51-¶ 70; 3-SER-666-72-¶¶ 12-13, 27, 32, 35; 3-SER-754-59-¶¶ 23, 28, 32, 36-37, 40-41, 43; 3-SER-706-08-¶ 24, 27-29; 3-SER-726-27-¶¶ 16, 19; 3-SER-779-¶¶ 24; 3-SER-697-99-¶¶ 22, 25, 29, 31. Thus, under the presumption, the Government must show the conditions are legitimate and not excessive, which it cannot do.

**b. Even without the *Jones* presumption, conditions at Adelanto are unconstitutionally punitive.**

Even if the *Jones* presumption does not apply, ample record evidence shows that at Adelanto, conditions are unconstitutionally punitive because they are (1) "intended to punish," (2) "excessive in relation to [their] non-punitive purpose," or (3) "employed to achieve objectives that could be accomplished in so many alternative and less harsh methods." *Jones*, 393 F.3d at 932. As the district court correctly found, Plaintiffs are likely to succeed on each of these independent bases. 1-ER-32-35.

*First*, the Government has admitted the detention conditions are intended to punish and coerce immigrants to leave the United States. ICE's website warns: "If ICE arrests you because you didn't turn yourself in, the agency will detain and

remove you—and you may have to spend several months in detention while you're awaiting removal." 1-SER-246. Standing alongside then-DHS Secretary Noem while opening a detention facility in Florida, Governor Ron DeSantis stated, "You'll have a lot of people that will deport on their own because they don't want to end up in an Alligator Alcatraz, or some of these other places." 1-SER-249. These statements demonstrate "that harsh conditions of confinement are a deliberate feature ... intended to induce self-deportation and to deter illegal immigration," *Mercado v. Noem*, 800 F. Supp. 3d 526, 575-76 (S.D.N.Y. 2025), which is an illegitimate, punitive objective, *Bell*, 441 U.S. at 539, n.20; *see also Kansas v. Crane*, 534 U.S. 407, 412 (2002) (civil detention cannot be a "mechanism for retribution or general deterrence").

*Second*, the conditions are excessive to any purported non-punitive purpose. Undisputed expert testimony establishes that there is no legitimate, non-punitive interest that justifies depriving people of basic human necessities like food, water, privacy, outdoor time, and basic sanitation and hygiene. 2-SER-343-73-¶¶ 45, 47, 69, 82, 94, 104, 114, 122, 136, 149. Caselaw—from the more demanding Eighth Amendment context—confirms this. *See Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996), *opinion amended on denial of reh'g*, 135 F.3d 1318 (9th Cir. 1998) (Eighth Amendment guarantees access to water); *Graves v. Arpaio*, 623 F.3d 1043, 1050-51 (9th Cir. 2010) (Eighth Amendment guarantees access to sufficient food);

*Hoptowit*, 682 F.2d at 1258 (Eighth Amendment guarantees basic sanitation); *see also Flores v. Barr*, 934 F.3d 910, 915 (9th Cir. 2019) (access to clean water, clean facilities, sanitary food, appropriate bedding, clean clothing, medical care, soap, adequate sleep accommodations, and outdoor spaces necessary to provide "safe and sanitary conditions").

*Third*, to the extent the conditions are designed to achieve legitimate objectives—which is doubtful given the record—Defendants' own standards demonstrate that the harsh conditions are unnecessary. The PBNDS provide alternative, less harsh methods and, in fact, forbid the current practices at Adelanto. *See supra* at 5-6 (requiring, among other things, clean water, sanitary facilities, edible food, recreation time, and limiting use of solitary confinement). Prison operations also prove that less harsh methods exist and that the current conditions are unconstitutionally punitive. 3-SER-343-74-¶¶ 45, 47, 69, 82, 94, 104, 114, 122, 136, 149.

On appeal, the Government does not dispute that detainees are deprived of clean and warm clothing and bedding; privacy; contact visits; recreation time; water; and nutritious food.[7] Nor does the Government dispute the use of solitary

[7] The Government contends the tap water is tested and is potable and that the kitchens are clean. This says nothing about the jugs of water detainees use for water or about the quality of the food. Nor does it overcome the district court's factual finding to the contrary.

confinement or that headcounts occur six times a day and prevent detainees from accessing water, showers, food, and recreation. Instead, it argues security justifies these conditions, and cites one instance of passing contraband and one instance of a cut fence as support. Br. 40. Putting aside that there is no legitimate reason to deprive detainees of water, food, privacy, clothing, and sanitary conditions, 2-SER-339-¶ 31; *Shorter v. Baca*, 895 F.3d 1176, 1187 (9th Cir. 2018) (rejecting government rationales for depriving detainees basic needs), these same contraband and perimeter concerns exist in prisons, 2-SER-336-51-¶¶ 22-29, 70, yet the conditions are not similarly severe. Rather, prison officials use alternative, less punitive approaches to accomplish the same security interest. The Government's refusal to adopt similar approaches only confirms what it has openly stated—the conditions have no penological purpose, they are designed to punish.

No more persuasive is the Government's contention that it has broad discretion to impose the conditions. *Evitts v. Lucey*, 469 U.S. 387, 401 (1985) ("State … must … act in accord with the dictates of the Constitution.…"); *Nw. Ass'n of Indep. Schs. v. Labrador*, 166 F.4th 1148, 1170 (9th Cir. 2026) (government goals must yield when they collide with the Constitution). To the extent the Government has discretion under *Bell*, it is not so broad as to allow it to deprive detainees of water, food, sanitary conditions, access to the outdoors, and visitation with their families.

### 3. The Government's conduct violates the Rehabilitation Act.

To succeed on a section 504 of the Rehabilitation Act claim, subclass Plaintiffs must show that they: (1) are "qualified individual[s] with a disability; (2) [were] denied a reasonable accommodation that they need in order to enjoy meaningful access to the benefits of public services;" and (3) the program is conducted by an executive agency. *Csutoras*, 12 F.4th at 968-69 (cleaned up); 29 U.S.C. § 794(a).

The district court correctly found these elements satisfied—Plaintiffs L.T. and Salazar-Garza have mobility limitations and Mesrobian has recurring epileptic episodes; are entitled to receive benefits; have been denied reasonable accommodations to first-floor rooms and medical care; and the Government includes federal agencies. 1-ER-35-37.

Failing to advance its claims, the Government argues the wrong standard. The district court was not required to find that accommodations were denied "solely" because of Plaintiffs' disabilities. Br. 43-44. Section 504 imposes "an affirmative obligation" to make programs accessible, *Updike*, 870 F.3d at 949, which does not happen at Adelanto. Despite mobility issues, L.T. was denied a first-floor room, and Mesrobian was denied food to take his seizure medication. 3-SER-781-¶ 29; 4-SER-955-56-¶ 10. Those failures to accommodate are enough to show success on the merits.

The Government further argues that the district court ignored records showing that accommodations were given. Br. 44. But none of those records show that L.T. and Mesrobian received the accommodations they required. 2-SER-437-38-¶ 63; 3-SER-781-¶ 29; 4-SER-955-56-¶ 10. Nor is the Government's reliance on *Castle v. Eurofresh, Inc.*, 731 F.3d 901, 910 (9th Cir. 2013) persuasive. The district court made the plaintiff-specific findings that were missing in *Castle*, 1-ER-36, all of which are amply supported by the record. Finally, the Government is incorrect that "the accommodation function is GEO's." Br. 44. Delegating performance to a contractor does not remove the program from ICE's oversight. *See supra* I.B.

### B. Plaintiffs Established Irreparable Harm.

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Hernandez*, 872 F.3d at 994 (quoting *Melendres*, 699 F.3d at 1002). The record shows that at Adelanto, the Government has violated detainees' Fifth Amendment rights. That is enough to show irreparable harm. 1-ER-37.

### C. The Balance of Hardships and Public Interest Favor an Injunction.

When the government opposes an injunction, the balance of equities and the public interest merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). It is always in the public interest to "prevent the violation of … constitutional rights." *Melendres*, 699 F.3d at 1002. And it is always in the public

interest for the government to follow the law. *Seattle Audubon Soc'y v. Evans*, 952 F.2d 297 (9th Cir. 1991) (always in public interest to have government officials act in accordance with law). Applying these precedents, the district court correctly found these factors weighed in Plaintiffs' favor. 1-ER-37.

The Government's only response—that the district court failed to weigh the cost of compliance—falls short. Br. 48-50. The district court expressly stated that preventing human suffering outweighed the Government's financial concerns, 1-ER-37, a finding supported by ample case law from this Court, *Harris v. Bd. of Supervisors, Los Angeles Cnty.*, 366 F.3d 754, 766 (9th Cir. 2004) (pain, infection, medical complications, and death outweigh hardship to government's speculative budgetary shortfall); *Stone,* 968 F.2d at 858 ("Financial constraints do not allow states to deprive persons of their constitutional rights").

## IV. THE DISTRICT COURT DID NOT EXCEED ITS JURISDICTION IN MODIFYING THE PRELIMINARY INJUNCTION.

The Government argues the pending appeal deprived the district court of jurisdiction to modify the injunction. Sec. Br. 21-28; *see supra* at 18-23 (recounting procedural history). This argument finds no support in precedent or the Federal Rules.

A notice of appeal does not automatically divest a district court of jurisdiction to modify an injunction. *Sw. Marine*, 242 F.3d at 1166. Federal Rule of Civil

Procedure 62(d) allows a district court to "suspend, modify, restore, or grant an injunction during the pendency of the appeal upon such terms as to bond or otherwise as it considers proper for the security of the rights of the adverse party."[8] This Court has made clear that the district court retains authority pending appeal to preserve the status quo and supervise compliance with its injunctions, provided it does not "materially alter the status of the case on appeal." *Sw. Marine*, 242 F.3d at 1166.

On September 11, the district court issued its First Amended Preliminary Injunction, which clarified existing monitoring and access provisions. *See supra* at 18. The order did not, however, change the substantive requirements governing conditions, headcounts, segregation, and the medical-and-disability remedial plan. Nor did it change the appointment of a Medical Monitor to "observe and report on the systems for medical care and disability accommodations" and a Conditions Monitor to "focus on the conditions of confinement." *Compare* 1-ER-44-50, *with* 1-FER-3-21. *See also supra* at 21-22 (identifying at-issue modifications).

The Government argues that the changes created a new mandate by altering the scope of the Monitors' duties, expanding their access to information, and opening a privileged ex parte channel to chambers. Sec. Br. 21-26. But those changes did not alter paragraphs 1-4, *i.e.*, the substantive obligations, which are on appeal. The

---

[8] The Government incorrectly references Federal Rule of Civil Procedure 62.1(a). Sec. Br. 23. The district court had authority under Rule 62(d), making Rule 62.1 inapplicable.

Government does not argue otherwise. Nor do the changes alter the status quo. The Monitors were already tasked with assessing compliance with the substantive obligations and communicating their findings to the district court; the modified order merely made that obligation express. 1-FER-16-¶ 5 (clarifying the duty to ensure compliance extended to paragraphs 1-4). And it simply clarified *how* they would do so: by communicating issues directly to the court, 1-FER-20-¶ 5(j), accessing records, 1-FER-17-¶ 5(d), accessing Adelanto, 1-FER-17-¶ 5(d), (f), and accessing detainee grievances, 1-FER-19-¶ 5(h).

This Court has already held that similar clarifications do not alter the subject matter on appeal. In *Southwest Marine, Inc.*, this Court upheld modifications that specified how to implement an existing injunction—including the required testing depth and the deadline—because they clarified existing obligations without materially changing the status quo or interfering with the pending appeal. 242 F.3d at 1166-68. Likewise in *Meinhold v. U.S. Department of Defense*, this Court upheld modifications that clarified the original injunction and that supervised compliance. 34 F.3d 1469 n. 14 (9th Cir. 1994). *Cf. Gon v. First State Ins. Co.*, 871 F.2d 863, 866 (9th Cir. 1989) (substantive modification where the district court substantially changed the insurer's payment obligations); *Simon v. City and Cnty. of San Francisco*, 135 F.4th 784, 814-15 (9th Cir. 2025) (substantive modification where a subsequent order imposed new restrictions on searches).

Here, too, the district court's modifications merely clarified the Monitors' existing responsibilities. The subsequent orders specified how those functions would be carried out—including access to electronic records, confidential communications with detainees, and reporting procedures—without changing the conditions the Government was required to remedy.[9] 2-ER-128-133; 2-ER-168-171.

The cases the Government cites do not change the analysis. *McClatchy Newspapers v. Central Valley Typographical Union No. 46* invalidated an order requiring reinstatement of striking employees because the original judgment had decided only whether employment guarantees survived a strike, not whether reinstatement was warranted. 686 F.2d 731, 735 (9th Cir. 1982). *Valdivia v. Schwarzenegger*, 599 F.3d 984, 988 (9th Cir. 2010) addressed whether changes to injunctions constitute appealable modifications under § 1292(a)(1)—a different question. Nor do *Stotts* or *Salazar* support the Government. *Stotts* rejected relief that displaced third-party seniority rights beyond the scope of a consent decree, 467 U.S. at 574-76; *Salazar* rejected new obligations addressing different problems under a different statutory regime through expired decree provisions, 896 F.3d at 498-501. Neither involved clarifications implementing an existing injunction to remedy the same underlying violations.

---

[9] The Government's contention that reversal of the original decree would not "undo" its compliance steps is nonsensical. Sec. Br. 25. Reversal would reinstate the original injunction, thereby eliminating the added provisions.

## V. THE PRELIMINARY INJUNCTION IS LAWFUL IN FORM AND SCOPE.

Federal Rule of Civil Procedure 65(d) provides that an injunction is "binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys," and "requires the language of injunctions to be reasonably clear so that ordinary persons will know what action is proscribed." *Golden State Bottling Co., Inc. v. NLRB*, 414 U.S. 168, 178 (1973). "Injunctions are not set aside under Rule 65(d), however, unless they are so vague that they have no reasonably specific meaning." *United States v. Holtzman*, 762 F.2d 720, 726 (9th Cir. 1985).

The Government challenges each iteration of the preliminary injunction, *i.e.*, the July 2026 preliminary injunction, 1-ER-44-51, the August 2026 modification, 1-ER-2-43, and the September first amended preliminary injunction (the "Decree"), 2-ER-125-143, under Rule 65(d).[10] In support, the Government argues the Decree improperly binds non-parties; is insufficiently specific and tailored; and depends on a future remedial plan. The Government further argues that the Decree improperly delegates power to the Monitors and offends separation of powers.[11] None warrant reversal.

---

[10] For ease, Plaintiffs address the Government's argument through the First Amended Preliminary Injunction, which includes the district court's initial preliminary injunction order and first modification.

[11] The Government incorrectly presents these as Rule 65(d) arguments. Br. 55-56, 60-62. Because they are incorporated with the Government's Rule 65(d) arguments, Plaintiffs address them here.

### A. The Decree Permissibly Binds ICE and Its Agents.

The Government argues that the Decree fails under Rule 65(d)(2) because it binds GEO, a nonparty, and holds ICE responsible for GEO's performance. Rule 65(d)(2)(B), however, permits the injunction to bind GEO as ICE's agent, *Sequoia*, 568 F.2d at 633-34; *see also K.C. ex rel. Africa H. v. Shipman*, 716 F.3d 107, 115-16 (4th Cir. 2013) (applying that principle to a government contractor performing services on an agency's behalf), which GEO admits being, Pet. for Writ of Cert. at *22-23, *The Geo Group, Inc. v. Nwauzor*, No. 25-828 (Jan. 9, 2026), 2026 WL 178295 (arguing the federal government's right to "select and use its chosen *agents* to carry out federal functions" cannot be burdened) (emphasis added).

Regardless, it does not matter that the Government may need to direct GEO to satisfy the Decree's obligation to provide constitutional conditions. Sec. Br. 58-60. Rule 65(d) requires only that the injunction specify what the Government must accomplish, not how it must accomplish it. *See Fortyune,* 364 F.3d at 1087.

Nor does it matter that the Decree requires cooperation from GEO. Rule 65(d)(2) limits whom an injunction binds, not whether compliance may depend on third-party cooperation. *See Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 483 (9th Cir. 2022) (injunctions can bind those "subject to" defendants control); *Parsons v. Ryan*, 912 F.3d 486, 500-01 (9th Cir. 2018) (upholding injunction requiring prison officials to use outside help to achieve

compliance); *see also Harris v. City of Philadelphia*, 47 F.3d 1333, 1341-42 (3d Cir. 1995) (affirming contempt where city failed to secure compliance through contracting, funding, and monitoring).

Indisputably, the Government can secure GEO's cooperation through multiple means, including correction-monitoring, withholding payment, terminating the contract, or transferring detainees. *See supra* at 7; 1-ER-10-11, 22-23. The Government's own filings confirm this. ICE has implemented the Decree's requirements through contractual modifications that provide the Monitors access to GEO's electronic records, ensure intake screenings within eight hours, increase nursing staff, and establish a dedicated disability-accommodations coordinator. 2-ER-124, 154-55.

The Government's authorities are irrelevant. Sec. Br. 54-56. *General Building Contractors Ass'n v. Pennsylvania* addressed vicarious liability for a third party's misconduct absent an agency relationship, not the scope of an injunction against an agent. 458 U.S. 375, 393-94 (1982). *Pasadena Republican Club v. Western Justice Center* addressed whether a private lessee's conduct could be attributed to the government for purposes of § 1983 liability. 985 F.3d 1161, 1172 (9th Cir. 2021). And *Natural Resources Defense Council v. Haaland* concerned whether an agency retained sufficient contractual discretion to trigger a statutory duty under the Endangered Species Act. 102 F.4th 1045, 1075-76 (9th Cir. 2024).

The related contempt objections are premature. Br. 52-55; Sec. Br. 48-53. The Government concedes that it only has been "exposed" to a possible fine for noncompliance. Sec. Br. 53. The district court has not issued a fine or found the Government in contempt,[12] making this an unripe hypothetical,[13] *e.g.*, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021); *In re MacNeil*, 907 F.2d 903, 904 (9th Cir. 1990) (in the absence of a factual determination, the court would be rendering an improper "advisory opinion"), and not sufficiently final for appellate review, *Plata v. Schwarzenegger*, 560 F.3d 976, 980-81 (9th Cir. 2009) (dismissing an appeal from an order threatening contempt because further proceedings remained); *SEC v. Hickey*, 322 F.3d 1123, 1127-28 (9th Cir. 2003) (same).

Whether ICE has taken all reasonable steps to comply remains unresolved. *Stone*, 968 F.2d at 856. Moreover, the contempt orders are not properly before this Court. The Government's second notice of appeal challenged the modifications to the preliminary injunctions, not the "contempt" proceedings. 2-ER-165; *Whitaker v. Garcetti*, 486 F.3d 572, 585-86 (9th Cir. 2007) (declining to review a later order absent a new or amended notice of appeal).

---

[12] In fact, the district court invited the Government to seek relief if "any provision of the injunction cannot be fulfilled," 1-SER-276, which it has not done.

[13] The Government cites *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935 (9th Cir. 2014) as support. There, the Court found contempt in the first instance. *Id.* at 940. It does not permit the court to weigh on the possible permissibility of contempt orders.

The Government's cases are distinguishable: each involved an actual contempt finding. *See, e.g.*, *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 823 (1994) (evaluating contempt fines levied against a union); *United States v. Rylander*, 460 U.S. 752, 753 (1983) (respondent held in civil contempt); *U.S. v. Int'l Bhd. of Teamsters*, 899 F.2d 143, 146 (2d Cir. 1990) (same); *Newman v. Graddick*, 740 F.2d 1513, 1528 (11th Cir. 1984) (same). And in *Teamsters*, 899 F.2d at 147-48, and *Newman*, 740 F.2d at 1528, the parties had to secure actions beyond their lawful authority. ICE, by contrast, has contractual authority to secure GEO's cooperation—and has. 2-ER-124, 154-55.

### B. The Decree Is Specific and Tailored.

Under Rule 65(d)(1), an injunction must state the reasons for its issuance, state its terms specifically, and describe in reasonable detail the act or acts restrained or required. The Decree does exactly that—it mandates concrete, measurable conditions, including 24-hour access to potable water, sanitary meals, daily cleaning and mold remediation, at least four hours of yard access, contact visitation, limits on the frequency and timing of headcounts, and procedural protections before administrative segregation. 1-FER-3-5.

The Government challenges three monitoring provisions: equipment "needed" for inspections, court personnel "as needed," and electronic records that "will help" the Monitors perform their duties. Sec. Br. 34-36. It also challenges the

district court's requirement of remote access despite the Decree's "on-site or remote" language. Sec. Br. 29-30, 35. Each challenged phrase addresses a specific monitoring function. These terms are not "so vague that they have no reasonably specific meaning," *Fortyune*, 364 F.3d at 1087, or so uncertain they cause "confusion" and require a court to prescribe every detail of compliance, *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). This Court has already determined that the underlying injunction has "specific directives with which to comply." Order Denying Stay at 5.

The Government further argues that the August 28 and September 11 orders modifying the preliminary injunction violate Rule 65(d)(1) because they do not state the reasons for their issuance. Sec. Br. 32-34. But those orders merely clarified the procedures for implementing the existing injunction; they did not impose new substantive obligations requiring fresh findings to justify the underlying relief. *See Parsons*, 912 F.3d at 501 (holding new constitutional findings unnecessary where an enforcement order remedied the same violations underlying existing relief). The district court already explained the factual and legal basis for that relief in its August 12 memorandum. 1-ER-2-43.

The Decree's flexibility preserves ICE's operational discretion without sacrificing specificity. *See* Br. 57-62. Nor does the district court's reference to future amendments as "first amended, second amended, third amended" suggest an

intention to rewrite the injunction indefinitely. Br. 37. The court instead memorialized its clarifications in written, reviewable orders. 1-FER-7-8.

The three phrases the Government challenges are likewise sufficiently specific. Sec. Br. 34-35.

*First*, the Decree allows the Monitors to bring materials and equipment "needed to facilitate their inspections," subject to ICE's security protocols. 1-FER-7-8. The Government agreed to this provision at the September 4 hearing. 2-ER-74-77. It cannot now claim inadequate notice.

*Second*, the Decree permits "the Court and its staff, including the United States Marshals," to accompany inspections "as needed." 1-FER-7. The phrase "as needed" gives the court discretion to determine when accompaniment is necessary. ICE must permit entry.

*Third*, Paragraph 5(f) requires the Monitors to have "24/7 access (on-site or remote) to any electronic records that will help facilitate their general duties." 1-FER-8. The Government argues that "or" is disjunctive and permits ICE to choose between the two methods. Sec. Br. 29-30. But that dispute concerns enforcement, not specificity. The injunction requires read-only, round-the-clock access—while accommodating Defendants' security protocols and system configurations. 1-FER-7-8. The district court's acknowledgment that it did not "know how their system works," 2-ER-66 at 14:3-13, reflects the appropriate division of responsibility: the

court establishes the obligation; Defendants determine how to implement it. Whether the district court could subsequently require remote rather than on-site access is a separate enforcement question—not a defect in the injunction's specificity.

Unlike the vague TRO in *Reno Air Racing Association v. McCord*, the Decree provides "fair and well-defined notice" through concrete entry and record-access requirements. 452 F.3d 1126, 1132-33 (9th Cir. 2006). The Government's reliance on *Pasadena City Board of Education v. Spangler*, 427 U.S. 424, 435-36 (1976), and *Roman,* 977 F.3d at 935, 946, is equally misplaced. *Spangler* rejected continuing annual adjustments to substantive desegregation requirements; *Roman* rejected incorporation of external public-health guidance into an injunction governing detention conditions. Neither prohibits a district court from specifying procedures necessary to implement an existing monitoring regime.

### C. The Inclusion of a Remedial Plan Term Does Not "Refer to" Another Document.

The Government next argues the Decree violates Rule 65(d)(1)(C) by referring to a future remedial plan. Br. at 55-56; Sec. Br. 38.

But the rest of the Decree specifies the required conditions and medical care. *See Edmo v. Corizon, Inc.*, 935 F.3d 757, 800 (9th Cir. 2019) (rejecting overbreadth challenge because injunction, "read in context," limited the scope of the relief required). Nor does the Decree "refer to another document," Rule 65(d)(1)(C), in

the manner alleged. Citing *Roman*, the Government contends any "unwritten document" renders a decree void for failure to give notice. Br. at 57. But there, the Decree referenced the CDC's guidelines for correctional and detention facilities, a 25-page document that made "hundreds of [vague] recommendations, many of which lack specificity." 977 F.3d at 946. Here, in contrast, the remedial plan explains how the specific, substantive obligations will be implemented.

The Government misreads *Skinner*, 113 F.4th 1126. There, the Ninth Circuit distinguished an injunction that left "huge gaps" for a special master to fill from orders containing "specific directives" that a monitor could help implement. *Id.* at 1139-40. Here, the injunction specifies the required medical care and disability accommodations and directs the Government—not the Monitors—to develop an implementation plan. 1-FER-5-6 ¶ 4. The Medical Monitor may review the plan, the parties may respond, and the district court must approve it. 1-FER-7 ¶ 5(b).

### D. The Decree Does Not Delegate Substantive Authority to the Monitors.

The Government contends that the Decree delegates substantive authority to the Monitors, allowing them to adjudicate violations and add substantive terms, without adequate notice and hearing. Sec. Br. 34-46.

The Decree's terms undermine the Government's argument. Through Paragraphs 1 through 4, the district court set the conditions that Defendants must maintain, including requirements for sanitation, nutrition, medical care, and

disability accommodations. 1-FER-3-6. Paragraph 5, by contrast, authorizes the Monitors to investigate and "ensure compliance" with Paragraphs 1-4. 1-FER-6-7. Likewise, paragraph 5(j) permits the Monitors to confer ex parte with the district court regarding any "issue[s] arising under or relating to the preliminary injunction order." 1-FER-10. But the Monitors cannot adjudicate violations or impose new obligations; that authority remains with the district court. *See Armstrong*, 768 F.3d at 987-88 (recognizing courts may appoint nonjudicial officers to make recommendations subject to judicial review); *A&M Records*, 284 F.3d at 1097 (upholding use of technical advisor who assisted in monitoring compliance without displacing district court's judicial role).

The Government's reliance on *Gates v. Shinn*, 98 F.3d 463 (9th Cir. 1996), is misplaced. There, a court-appointed mediator interpreted a general requirement of "appropriate" psychiatric care to impose thirteen additional substantive obligations, which the district court then enforced through contempt sanctions. *Id.* at 464-66, 468. No such sanctions or alterations exist here. This Court already recognized that the Monitors' recommendations "must be adopted by the district court before they become effective." Order Denying Stay at 5.

The Government's reliance on Federal Rule of Civil Procedure 53 is equally misplaced. The Monitors are court-appointed experts under Rule 706, not special masters. Br. 56; 2-ER-253; 2-SER-278. They issue no orders, hold no hearings, and

make no binding rulings. *Cf. Plata v. Schwarzenegger*, 603 F.3d 1088, 1096 (9th Cir. 2010) (recognizing that "the functions of a monitor differed greatly from those of a special master"). The Government identifies nothing to the contrary.

### E. The Government Had Notice Before Modifications Were Made.

The Government challenges the ex parte communications and resulting provisions governing facility entry, electronic records, inspection equipment,[14] and detainee comments. Br. 15; Sec. Br. 27-28, 31-33, 61-62; *supra* IV.

At the threshold, the Government's objections to the ex parte communication provisions are waived. The first objection to the provisions came in the Government's October 9 stay application, which the district court denied for unexplained delay of 42 days. 2-FER-28-29. Arguments a party had ample opportunity to raise below are waived. *Armstrong*, 768 F.3d at 981-82 (declining to consider arguments defendants had ample opportunity to raise below).

Ex parte communications do not violate due process when the parties have an opportunity to be heard before adjudication. *See Armstrong,* 768 F.3d at 987-88 (upholding requirements to investigate and report violations while rejecting expert's authority to adjudicate noncompliance); *Skinner*, 113 F.4th at 1139-40 (upholding

[14] The Government implies these provisions also followed ex parte communications. In fact, these followed stipulations between the parties. 2-SER-304-06.

monitor's authority where parties could challenge its decisions before district court, which retained ultimate authority over compliance).

The district court afforded that opportunity here. *See supra* IV; 2-ER-55-56, 64-88, 153-63, 177-200. The Government identifies no instance in which the court relied on undisclosed facts without allowing the parties to respond. *E.g.*, 1-FER-17-20 (disclosing, by highlighting, all changes reflecting *ex parte* conversations with the monitors, each reflecting procedural changes discussed with or proposed by the parties).

The record demonstrates this is true. In response to the Government's objections, the court changed the records-access provision to permit access "[o]n-site or remote" and expressly required compliance with Defendants' security protocols and system configurations. Sec. Br. 37-38; 1-FER-8. Unlike *Hughes v. United States*, 342 U.S. 353 (1952), and *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423 (1974), the Government received the proposed terms, objected twice, and secured changes before entry of the operative order. The Government took positions on "almost all" of the proposed changes, 2-ER-56-82, and prevailed on several: the Monitors must comply with the Government's security protocols and system configurations (1-FER-8) and 24/7 access includes "on-site or remote" access. Sec. Br. 37-38. A court that "changed parts of the order based on

[a party's] objections" has given that party notice and an opportunity to be heard. *Stone*, 968 F.2d at 859.

This is the process *Armstrong* approved. There, the district court explained its concerns and intended changes and let the State respond, a process this Court found more than sufficient for injunction-modification. 768 F.3d at 979-80. Here, the Government received the complete written text of every proposed change, with its source marked, two days before the conference, it won several points, and agreed to changes by stipulation. 2-ER-95-97, 153, 158.

The Government's cases—*Cobell v. Norton*, 334 F.3d 1128 (D.C. Cir. 2003), and *FTC v. Enforma Natural Products, Inc.*, 362 F.3d 1204 (9th Cir. 2004)—are inapposite. In *Cobell*, the D.C. Circuit held the district court lacked authority to appoint a monitor where it had not entered an injunction and where the Government withdrew consent to the monitor. 334 F.3d at 1133-34. That has no application here. In *Enforma*, the Ninth Circuit vacated an injunction where the district court relied on substantive advice from a court-appointed expert during an unrecorded conference but did not disclose that advice to the parties. 362 F.3d at 1213-15. In contrast, the Government had an opportunity to be heard on the provisions at issue and raised objections 2-ER-55-56, 64-88.

Nor do *McClatchy* and *Simon* help the Government. In *McClatchy*, the district court ordered reinstatement—a substantive remedy not adjudicated in its original

judgment. 686 F.2d at 735. In *Simon*, the district court expanded an injunction beyond its express prohibition. 135 F.4th at 814-15. Here, by contrast, the original injunction already authorized inspections and access to records. *See supra* at 21-22.

### F. The Decree Does Not Offend Separation of Powers.

The Government's separation-of-powers argument confuses judicial enforcement of constitutional rights with executive administration of detention facilities. Br. 60-62. The Executive's discretion over immigration detention remains subject to constitutional limits. *Stone*, 968 F.2d at 861 (courts have authority "to remedy constitutional violations"); *Roman*, 977 F.3d at 945-46 (same).

The Government's authorities are not persuasive. *GEO Group, Inc. v. Newsom*, 50 F.4th 745, 751 (9th Cir. 2022) (en banc), concerned a State's interference with federal detention policy under the Supremacy Clause—not a federal court's enforcement of constitutional rights. *Committee of Central American Refugees v. INS*, 795 F.2d 1434, 1441 (9th Cir. 1986), cautioned against judicial supervision of the Executive's discretion to select detention locations. And *O'Shea v. Littleton*, 414 U.S. 488, 500-02 (1974), and *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1044-45 (9th Cir. 1999) (en banc), rejected ongoing judicial supervision where the plaintiffs had not established entitlement to prospective relief. None prohibit oversight necessary to remedy constitutional violations.

Nor does the Decree transfer operational authority to the Judiciary. Br. 61. ICE and GEO retain responsibility for administering Adelanto. The Monitors inspect and report on compliance; they cannot direct employees, change policies, or impose binding obligations. *See* 1-FER-6-11. They provide the court "an eye into what is happening at Adelanto." They do not "dictat[e] what must happen." 3-ER-369-70. *Cf. Skinner*, 113 F.4th at 1136, 1139-40 (allowing a monitor to exercise limited operational control). Unannounced inspections and periodic reporting verify compliance with judicial orders; they do not transfer executive power to the Judiciary.

## VI. THE DISTRICT COURT CORRECTLY CERTIFIED THE ADELANTO CLASS & DISABILITY SUBCLASS.

Under Federal Rule of Civil Procedure 23, class certification is appropriate where a party shows: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. The district court correctly found these factors satisfied and certified the Adelanto Class and Disability Subclass, identifying twelve common questions for the Class and three for the subclass concerning the Government's systemic failures to provide adequate medical care, disability accommodations, and constitutional conditions of confinement at Adelanto. Notably, this Court has repeatedly found Rule 23 satisfied in comparable contexts. *See Parsons*, 754 F.3d at 676-89 (rejecting argument that healthcare and conditions-of-confinement claims are inherently individual specific); *Roman*, 977 F.3d at 944-45 (affirming class

certification where "due process violations exposed *all* Adelanto detainees to an unnecessary risk of harm").

The Government's arguments fail. Br. 62-67; Sec. Br. 60-66. As this Court has already suggested, the district court neither misapplied 8 U.S.C. §§ 1252(f)(1), 1231(g), nor abused its discretion in certifying the class. Order Denying Stay at 4. This Court should affirm.

**A. 8 U.S.C. § 1252(f)(1) Does Not Bar Classwide Relief.**

The district court's classwide injunction does not violate 8 U.S.C. § 1252(f), which "prohibits lower courts from entering [classwide] injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out [8 U.S.C. §§ 1221-1232]." *Aleman Gonzalez, 596 U.S. at 550.*

Under 8 U.S.C. § 1231(g)(1), the Attorney General "shall arrange for appropriate places of detention" and "acquire … and operate facilities … necessary for detention." The Government argues the injunction interferes with that duty and violates 8 U.S.C. § 1252(f) by prescribing the "detention arrangements" at Adelanto, including the entry, access, and grievance systems. Sec. Br. 61-62.

But the Government overreads the jurisdictional bar in section 1252(f). Under the injunction, the Government can still decide the "appropriate place of detention," whether Adelanto or another facility. This Court agreed. Order Denying Stay at 4. The injunction requires only that Adelanto comply with the Constitution and the

Rehabilitation Act. To the extent the Government argues that interferes with its ability to decide "appropriateness," Sec. Br. at 62, bedrock separation-of-powers principles forbid that argument. The Judiciary, not the Executive, decides whether detention conditions satisfy constitutional and statutory requirements. *E.g.*, *Patchak v. Zinke*, 583 U.S. 244, 249-50 (2018) ("The separation of powers, among other things, prevents Congress from exercising the judicial power.").

The Government's three remaining arguments fail. *First*, the Government argues that the Decree indirectly restrains § 1231(g) because relocation is one way to comply. Br. 27-28. But the Government can comply by improving conditions at Adelanto. The fact that it could instead relocate detainees does not transform an injunction governing conditions into one governing placement. At most, any effect on § 1231(g) is collateral, and § 1252(f)(1) does not bar an injunction that has "some collateral effect on the operation of a covered provision." *Aleman Gonzalez*, 596 U.S. at 553 n.4.

*Second*, the Government argues that the remedial plan and Monitor reports add procedural steps to detention operations. Br. 28 (citing *Al Otro Lado v. EOIR*, 138 F.4th 1102, 1125 (9th Cir. 2025), *rev'd on other grounds*, *Mullin v. Al Otro Lado*, 609 U.S. 258 (2026)). But the remedial plan and reports concern medical care and conditions, not any step in deciding whom to detain or remove.

*Third*, the Government wrongly argues that Plaintiffs seek to enforce 8 U.S.C. § 1231(g)(1), which section 1231(h) prohibits. Sec. Br. 61-65. Plaintiffs assert Fifth Amendment and Rehabilitation Act claims, not a section 1231(g)(1) claim. Plaintiffs cite section 1231(g)(1) only to establish ICE's duty to "arrange for appropriate places of detention."

*Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015), is not to the contrary. There, the Supreme Court held that, while equity cannot be used to enforce a statute that implicitly precludes private enforcement, *id.* at 328, courts may "enjoin unconstitutional actions by state and federal officers," *id.* at 327. *Friends of the Everglades, Inc. v. Secretary of United States Department of Homeland Security*, 174 F.4th 822, 834 (11th Cir. 2026) and *Van Dinh v. Reno*, 197 F.3d 427, 433 (10th Cir. 1999) are likewise distinguishable. In both, the district courts explicitly enjoined the federal government from transferring immigrants to certain facilities. The remaining cases the Government cites are inapplicable. *See Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 647-48 (9th Cir. 1998) (assessing application of the Tucker Act); *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 118 (2011) (private parties could not circumvent private-enforcement bar by suing as third-party beneficiaries of contracts incorporating the same statutory obligations).

### B. Rule 23's Prerequisites Are Satisfied.

**Numerosity.** The Government incorrectly argues the district court "speculat[ed]" on the number of class members. Br. 65. The Government's own figures show that Adelanto holds 1,592 detainees, 3-ER-509 ¶ 2, exposed to the inhumane conditions, and 74 detainees receiving disability accommodations, 3-ER-534-¶ 80. The district court's estimates of "at least 25 to 30" class members and "at least 8" subclass members were conservative figures drawn from the declarations in the record, not "[c]ounting beds rather than injured members." 1-ER-39; Br. 65. Regardless, numerosity "is not tied to any fixed numerical threshold," and classes as small as 15 are certifiable. *See Rannis v. Recchia*, 380 F. App'x 646, 651 (9th Cir. 2010) (citing *Gen. Tel. Co. of the Nw., Inc. v. EEOC*, 446 U.S. 318, 330 (1980). The classes here are much larger, making joinder impracticable. 1-ER-39; *see Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998) (Rule 23(b) does not limit a class to those already injured); *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 461 (9th Cir. 2000) (recognizing the district court's broad discretion in assessing numerosity).

**Commonality.** The Government primarily argues that commonality is not satisfied because the questions require a detainee-by-detainee inquiry. Br. 62-63. Not so. As the district court correctly found, the class members' claims turn on the same questions about the same facility-wide systems. That is exactly what commonality requires. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350

(2011) (commonality must "resolve an issue that is central to the validity of each one of the claims in one stroke").

The Government is wrong on two counts. *First*, the Government says the common questions "incorporate[] the attribution theory" because each asks whether Defendants "failed to ensure that GEO" performed a function. Br. 62. That is a merits objection, and it fails for the reasons given *infra* VI.C. Regardless, the question has a common answer for all class members.

*Second*, the Government claims the questions require a "detainee-by-detainee inquir[y]." Br. 62. This Court already rejected that argument in *Parsons*, calling it a "fundamental misunderstanding of *Wal-Mart*." 754 F.3d at 676. There, the challenged systemic health-care and conditions practices created commonality because resolution required answering "in a single stroke" whether the conditions created "a systemic, substantial risk of harm." *Id.* at 679. So too here. Resolving whether all detainees have access to potable water, sanitary facilities, and medical care goes directly to whether Adelanto's systems are adequate. Several common contentions strengthen commonality; they do not defeat it.

The Government's authorities do not suggest otherwise. *Wal-Mart* involved millions of discretionary employment decisions across thousands of stores, with no common mode of resolving the class questions. 564 U.S. at 355-56. That GEO may

exercise "decentralized discretion," Br. 62-63, is irrelevant. Unlike *Wal-Mart*, Plaintiffs challenge the *systems*, not the discretionary decisions themselves.

At Adelanto, every class member drinks the same water, eats from the same kitchen, and depends on the same intake, sick-call, and emergency systems. 1-ER-3-4, 16-17. And unlike *Black Lives Matter L.A. v. City of Los Angeles*, where the district court "did not identify questions common to the class," the district court identified *fifteen* common questions. 113 F.4th 1249, 1265 (9th Cir. 2024). Finally, *Ronduen v. GEO Group, Inc.*, has no application. 2025 WL 3050059 (C.D. Cal. Sept. 26, 2025). There, the claims did not address systematic issues but turned on different levels of exposure to HDQ Neutral. *Id.* at *7.

**Typicality.** The Government next faults the district court for skipping over typicality. Br. 63. But the district court specifically considered typicality and correctly found that exposure to the same conditions exposed Plaintiffs and class members to the same substantial risk of harm. 1-ER-42. That is exactly what typicality requires. *Parsons*, 754 F.3d at 685 (citation omitted).

That individual Plaintiffs have different medical conditions is of no consequence. Br. at 64. The shared exposure to Adelanto's deficient systems exposes Plaintiffs and class members to substantial harm. *See Parsons*, 754 F.3d at 685-86 ("It does not matter that the named plaintiffs may have in the past suffered varying injuries or that they may currently have different health care needs; Rule

23(a)(3) requires only that their claims be 'typical' of the class"). The robust record shows this. *See supra* D.1, D.3. Different individual needs, but same failed systems: that is typicality.

**Adequacy.** The Government last faults the district court for skipping adequacy. Br. at 63-65. Again, the district court specifically considered adequacy, and correctly found the requirement satisfied because Plaintiffs and counsel had no "conflicts of interest with other class members" and counsel would "prosecute the action vigorously on behalf of the class." 1-ER-42 (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)); *see also* 4-SER-943-86.

The Government's only response—that three of the four Individual Plaintiffs never filed grievances—is irrelevant. Br. 64-65. That is not a requirement to show adequacy. Nor is *Hodgers-Durgin v. de la Vina* persuasive. 199 F.3d 1037 (9th Cir. 1999) (en banc). That case addressed standing to represent a class, not adequacy of representation. *Id.* at 1045.

### C. Rule 23(b)(2) Certification Was Proper, and *CASA* Does Not Apply.

Rule 23(b)(2) allows class treatment when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *Wal-Mart*, 564 U.S. at 360. The rule primarily applies in civil rights cases and where, as here, the class seeks declaratory and injunctive relief for

alleged widespread constitutional violations in a detention facility. *Parsons*, 754 F.3d at 686. The district court correctly found this rule met. 1-ER-43.

On appeal, the Government argues Rule 23(b)(2) does not apply because the Decree consists of "condition-specific mandates irrelevant" to the class as a whole. Br. 65-66. But an order requiring safe drinking water, a functioning sick-call system, sanitary food, and lawful use of restrictive housing affects all detainees at Adelanto, both now and in the future. *See Walters*, 145 F.3d at 1047 (injunction can extend to future members not yet injured). It is nonsensical to say, as the Government does, that some detainees may have "no need." Br. 67. All detainees, at Adelanto, now or in the future, need clean water, edible food, proper medical care, and humane conditions.

The Government's remaining authorities are inapposite. *Jennings v. Rodriguez* questioned whether Rule 23(b)(2) was appropriate for claims seeking individualized bond hearings, 583 U.S. 281, 313-14 (2018), but did not disturb *Parsons*' holding that systemic conditions exposing detainees to a common risk of harm supports Rule 23(b)(2) relief. *Shook v. Board of County Commissioners* affirmed a discretionary denial of certification where, unlike here, the requested relief could not be fashioned on a classwide basis. 543 F.3d 597, 614 (10th Cir. 2008). And *TransUnion* addressed Article III standing in a damages action, expressly leaving class-certification questions unresolved. 594 U.S. at 431 n.4.

Nor does *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), call the certification into question. *CASA* addressed universal injunctions extending relief to nonparties; it did not involve a certified class and did not alter Rule 23. And Justice Alito's concurrence expressly stated so: "[p]utting the kibosh on universal injunctions does nothing to disrupt Rule 23's requirements." *Id.* at 868. The stay panel agreed. Order Denying Stay at 3-4. That the Decree could serve as a "template" elsewhere, Br. 67, is not a Rule 23 defect; it is a description of precedent and an application of common law.

In sum, the district court acted within its broad discretion in concluding that the class and subclass satisfy Rule 23. This Court should affirm.

## CONCLUSION

This Court should affirm the preliminary injunction and the class certification.

Dated: November 13, 2026

Respectfully Submitted,

WILLKIE FARR & GALLAGHER LLP

By: */s/ Nicholas Reddick*
Nicholas Reddick
Stephen Henrick
Alyxandra Vernon
Jacob Karim
333 Bush Street
San Francisco, California 94104
Tel: (415) 858-7400

Vincent R. Biagiotti (*pro hac vice*)
787 Seventh Avenue
New York, NY 10019-6099
Tel: 212-728-8000

PUBLIC COUNSEL

By: */s/ Rebecca Brown*
Rebecca Brown
Sophia Wrench
Amelia Piazza
Belinda Escobosa
610 South Ardmore Avenue
Los Angeles, CA 90005
Tel: 213-385-2977

IMMIGRANT DEFENDERS LAW CENTER

By: */s/ Alvaro M. Huerta*
Alvaro M. Huerta
Carson Adrianna Scott
Alison Steffel
634 S. Spring Street, 10th Floor
Los Angeles, CA 90014
Tel: 213-634-0999

COALITION FOR HUMANE IMMIGRANT RIGHTS

By: */s/ Carl Bergquist*
Carl Bergquist (*pro hac vice*)
2351 Hempstead Road
Ottawa Hills, OH 43606
Tel: 310-279-6025

Adam Reese
2533 West Third Street, Suite 101
Los Angeles, CA 90057
Tel: 213-353-1333

*Attorneys for Plaintiffs-Appellees*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-4902, 26-6685 (Consolidated)

I am the attorney or self-represented party.

**This brief contains 18, 507 ___________ words,** including __________ words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
- [ ] it is a joint brief submitted by separately represented parties.
- [ ] a party or parties are filing a single brief in response to multiple briefs.
- [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated ______________.

[x] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** *s/ Nicholas Reddick* **Date** November 13, 2026
*(use "s/[typed name]" to sign electronically-filed documents)*